THE STATE OF OHIO, APPELLEE, *v.* GLENN, APPELLANT.

[Cite as State *v.* Glenn (1986), 28 Ohio St. 3d 451.]

(No. 85-877—Decided December 30, 1986.)

452

*Gary L. Van Brocklin,* prosecuting attorney, and *Mary Jane Stephens,* for appellee.

*Breckenridge & McCroom, John L. Breckenridge* and *E. Winther McCroom,* for appellant.

HOLMES, J. Appellant argues that R.C. 2903.01, 2929.02 through 2929.023, and 2929.03 through 2929.06 are unconstitutional under both the federal and Ohio Constitutions. These arguments generally have been presented to, and answered by, both the Ohio and United States Supreme Courts.

The death penalty itself is not cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution or the Ohio Constitution. See, *e.g., Gregg* v. *Georgia* (1976), 428 U.S. 153, 187, and *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 179. See, also, *State* v. *Brooks* (1986), 25 Ohio St. 3d 144, 154, and citations contained therein.

Appellant's second contention with regard to the constitutionality of the Ohio death penalty is that the statute provides a jury with unbridled discretion to weigh the aggravating circumstances and mitigating factors. Appellant maintains that this statutory scheme results in the wholly arbitrary and capricious actions warned against in *Furman* v. *Georgia* (1972), 408 U.S. 238. A similar contention was addressed and rejected in *State* v. *Jenkins, supra,* at 173.

Appellant's third argument within his first proposition of law focuses on opportunities for discretionary action inherent in the processing of any murder case, and argues that the risk of arbitrary infliction of the death penalty is not sufficiently reduced. The United States Supreme Court, addressing these arguments, held: "The existence of these discretionary stages is not determinative of the issues before us. * * * *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg, supra,* at 199. *Furman* does not prohibit discretion *per se* but requires that discretion in the area of sentencing be exercised in an informed and directed manner. *Gregg, supra,* at 189. The Ohio death penalty statute provides the sentencing authority with specific and detailed guidance in its decision whether to impose the death penalty or imprisonment for life. See, also, *Proffitt* v. *Florida* (1976), 428 U.S. 242, at 253. Thus, Ohio fulfills the mandate of *Furman*. Finally, the multi-tiered review structure under the Ohio statute also eliminates the arbitrary imposition of the death penalty. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 246; *Jenkins, supra.*

Appellant asserts that the victim's status as a volunteer reserve deputy sheriff is insufficient to qualify as a "peace officer." R.C. 2929.04 (A)(6) allows imposition of the death penalty on anyone who commits the crime of aggravated murder upon a peace officer as defined in R.C. 2935.01. By this reasoning, appellant concludes that either the specification should have been stricken from the indictment, or that the indictment was fatally defective and did not confer jurisdiction upon the trial court.

R.C. 2935.01(B) defines "peace officer" to include "a sheriff, deputy sheriff, marshal, deputy marshal, member of the organized police department of any municipal corporation, state university law enforcement officer appointed under section 3345.04 of the Revised Code, a police constable of any township * * *." Deputy sheriffs are to be appointed by the sheriff pursuant to R.C. 311.04. Also, a deputy sheriff is a peace officer when he is "commissioned and employed as a peace officer by a political subdivision of this state, and whose primary duties are to preserve the peace, to protect life and property, and to enforce the laws of Ohio * * *." R.C. 109.71.

It is uncontroverted that the victim fulfilled all the above requirements

and that he was duly appointed and was in the process of activities performed pursuant to his duties to enforce Ohio's laws. While transporting the prisoner, the victim was in full uniform and driving a sheriff's squad car. Although he served without remuneration, his responsibilities and training requirements were the same as those of a full-time deputy. He was, in every sense, one of those "public servants who regularly must risk their lives in order to guard the safety of other persons * * *." *Roberts* v. *Louisiana* (1977), 431 U.S. 633, 636 [5 O.O.3d 252]. Acting to preserve the peace of his community, John Litch nobly made the supreme sacrifice of his life. We therefore conclude that one who acts as a reserve or special deputy sheriff is a peace officer as that term is utilized in R.C. 2929.04(A)(6) and 109.71. Appellant's argument is therefore not well-taken.

It is contended that the trial court impermissibly interfered in the interrogation of prospective veniremen by restricting the subject matter of the voir dire and by interposing individual questions. After examining the record, it becomes quite clear that there was no abuse of discretion by the trial court. A trial judge is fully empowered to conduct the questioning of prospective jurors and may also direct such individual questions as he deems necessary.

Defense counsel's objections stem from occasions when the trial court refused to allow further questioning about the prospective juror's views on the death penalty. In one instance, counsel sought to obtain the hypothetical views on abolition of the death penalty, but only after the witness had stated that he had no bias against imposition of the death penalty. This further question was therefore irrelevant.

At another point, the venireman had been asked repeatedly by the court and defense counsel whether he could agree to recommend the death penalty. He answered affirmatively when asked whether he would "automatically vote against the death penalty," and affirmed that view consistently. Defense counsel's continued efforts at persuasion were apparently aimed at obtaining a modification of the answers. Clearly, however, the prospective juror was not confused as to the requirements of the law.

There was, therefore, no error in refusing to allow the lines of questioning sought by appellant.

Appellant's assertion that a distinct group was systematically excluded from the jury panel is, without more, unsubstantiated. The mere fact that only one black appeared in the array of prospective jurors neither indicates that minorities were systematically excluded, nor does it create a presumption that discrimination has occurred. Contrary to the requirements of *Hernandez* v. *Texas* (1954), 347 U.S. 475, 477-480, appellant has presented no evidence of intentional or systematic exclusion. Since appellant has "no constitutional right to be tried by a jury composed proportionately of members of his own race," his contention is meritless. *Anderson* v. *Johnson* (C.A.6, 1966), 371 F. 2d 84, 87.

Sheriff's department employees Robert Knight and Sgt. James S. Horvath each gave answers to defense counsel's cross-examination questions which indicated that appellant had been incarcerated at a prior time. This, appellant asserts, was error of such magnitude as to prejudice the proceedings and, further, was done willfully so as to constitute misconduct by a witness for the state pursuant to Crim. R. 33(A)(2).

While the witnesses' responses were unfortunate, there is nothing about the wording that would support the view that they were given with sinister motive or made so as to harm the appellant's case. Robert Knight was questioned about his duties as the custodian of records of medical treatment given to prisoners. In one of his responses he differentiated among those records, stating: "That is on Robert Glenn. That is John Glenn's chart there." This response seems natural, even if it did reveal that the witness had custody of, and brought records which included, appellant.

In the questioning of Sgt. Horvath, it was apparent that the question was carefully phrased so as to exclude matters not "in reference to this case." However, the question as asked apparently emphasized whether the officer had "seen or met or knew—come to known [sic] the defendant, John Glenn * * *." The trial court stated, out of the jurors' hearing, that he too believed the question to be an inquiry whether the witness had ever known appellant prior to the date of the crime. Ultimately, the court found that "* * * the question was so ambiguous that it lends itself to an answer." Consequently, the answer, although harmful to appellant, could quite innocently have been given, with no misconduct whatsoever. As to the harmfulness of the answer, the trial judge gave a clear and unequivocal curative instruction that the jury was to ignore the answer. It cannot, therefore, be said that appellant was thereby prejudiced or prevented from obtaining a fair trial.

Appellant points to statements made by the prosecutor during closing argument as having constituted prejudicial error, which appellant argues should have resulted in the granting of appellant's motion for a mistrial. The prosecution did state that the jury was the third of "three links to law enforcement." Clearly, this was a misstatement of the law and the trial court so informed the prosecutor in front of the jury. Further, the trial judge instructed the jury "to arrive at a just verdict. Consider all the evidence, make your findings with intelligence and impartiality and without bias, sympathy or prejudice, so that the state of Ohio and the defendant will feel that their case was fairly and impartially tried."

It is apparent that the error complained of was minor and did not affect a substantial right of the defendant. Crim. R. 33(A). In light of the court's immediate action to correct the prosecutor's misstatement and the insistence upon impartiality contained within the jury instructions, this error was harmless.

Appellant asserts that his Crim. R. 29(A) motion for acquittal should have been granted because the jury verdict was against the manifest

weight of the evidence. Specifically, it is argued that no evidence was offered to place the murder weapon in the appellant's hands at the scene of the crime. .

It is axiomatic that a reviewing court will not re-try those issues that were before the jury. Our consideration of this assigned error is limited to an examination of the record to determine whether the evidence presented, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State* v. *Walker* (1978), 55 Ohio St. 2d 208, 210 [9 O.O.3d 152]; *State* v. *Graven* (1978), 54 Ohio St. 2d 114, 117 [8 O.O.3d 113]. The weight to be afforded the evidence and the credibility of the witnesses are matters for the trier of fact.

In the present case, the difficulty of scientifically ascertaining the exact murder weapon is pronounced since shotgun pellets do not receive rifling marks as they travel down the usually smooth bore of a shotgun barrel. Consequently, circumstantial evidence must be relied upon if a particular shotgun is to be identified as the murder weapon. The same problem occurs when the license plates are removed from an auto prior to its use in the commission of a crime. Again, it is circumstantial proof that ordinarily connects such vehicle to the crime.

The case *sub judice* is replete with evidence not only indicating which particular shotgun was utilized, but also that appellant fired the weapon while at the scene of this crime and while utilizing the auto used in the crime. There was testimony which placed a particular sawed-off shotgun in appellant's custody at the time of the killing. This same weapon was scientifically determined to have been fired recently. Furthermore, appellant left this weapon at the home of Michael Pippin the evening of the date on which the crime was committed. Expert analysis also concluded that appellant had recently fired a gun. When discovered, the shotgun contained a spent shell. The shotgun pellets taken from the victim's body were of the same size and weight as those normally contained in the kind of shotgun shell fired from such a shotgun.

The auto of which appellant had custody during the time of the murder was found to have particles of blood and flesh on the driver's side door. Expert testimony established a near match between those particles of blood taken from the door and blood samples taken from the victim. The ultimate description of the vehicle which struck Deputy Litch's patrol car as transmitted by police dispatchers was consistent with the description given by eyewitnesses, and matched that of the car appellant was driving the day in question. Various descriptions of the occupants of the car and their attire also coincided with that of appellant and his half-brother, Robert.

Appellant spoke with two witnesses concerning his plans to effectuate Robert's escape. Otis Simmons, one of these witnesses, testified that appellant told him of the plan to "escape his brother." This conversation occurred before the killing, at which time the defendant attempted to buy

a car and borrow a gun from Simmons for this purpose. Alseen Lanier testified that John Glenn admitted to her that he perpetrated the shooting of Deputy Litch. Michael Pippin testified that Glenn and Robert left a shotgun wrapped in a towel at Pippin's house the afternoon of the shooting. Pippin also stated that Glenn left the car in question at the Pippin residence.

The vehicle which Glenn had borrowed that morning matched the description of the car observed to have been involved at the scene of the killing. A pair of coveralls similar to those worn by Mahoning County Jail inmates was found in the car left by Glenn at the Pippin residence. Particles consistent with the plaster cast which had been on Robert Glenn's leg were found in the vehicle abandoned by him on the floor of the front passenger's seat.

As shown by these facts to be found within the record, there was substantial, probative evidence from which the jury could decide, beyond a reasonable doubt, appellant's guilt for the offenses charged. While a considerable portion of the evidence presented is circumstantial, it is sufficient as a matter of law to sustain the conviction, and it is not so attenuated that reasonable minds must find the accused innocent. In addition, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of aggravated murder beyond a reasonable doubt. See *Jackson* v. *Virginia* (1979), 443 U.S. 307, 319. Thus, this proposition is without merit.

Following the rendering of the verdict, the trial court refused to grant appellant's motion to continue the sequestration of the jury through the end of the mitigation proceedings. Appellant contends that such refusal was prejudicial to appellant's rights in that the jury may have been exposed to publicity generated by the trial. We find no merit in this assertion.

The trial court is not required to sequester the jury during the period of time between the guilty verdict and the penalty phase. *Jenkins, supra,* at paragraph twelve of the syllabus. Additionally, the trial court thoroughly instructed the jurors as to their interim conduct. Upon the commencement of the mitigation stage of the trial, the court particularly inquired whether the jurors had read any newspapers or observed any television broadcasts concerning the trial; whether they had been contacted or otherwise had any discussions with family, friends, or others; and whether anyone had formulated opinions or conclusions as to the final outcome of the case. The jurors indicated that they had observed the court's instructions. Also, appellant has failed to demonstrate any particular instance of a publication reaching a particular juror. No juror was specifically singled out as having had his judgment undermined. The sole conclusion to be drawn from the record is that there was neither error nor prejudice to appellant derivable from the trial court's decision.

The trial court refused to admit defense Exhibits A, B, C and D. Ap-

458

pellant would have the court hold that such refusal was prejudicial error. Of course, "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 112. R.C. 2929.04(C) also provides that: "The defendant shall be given great latitude in the presentation of evidence of the [mitigating] factors * * *."

Exhibits A, B and C are each newspaper articles from the Cleveland Plain Dealer. They are entitled, respectively, as follows: "Few face the ultimate penalty in the county," "Innocent man wins release after sixteen years in prison," and "Ex-Deputy indicted for murder, kidnap." Rather than a presentation of mitigating factors, these articles debate the philosophical basis for the death penalty. They do not relate to either appellant's character or the circumstances of the crime. Therefore, these exhibits are irrelevant and no error occurred in refusing to admit them.

Appellant was also refused admission of his Exhibit D which was a videotaped account of appellant's background. It included interviews with his mother and a former employer and was narrated by a local television producer. As previously mentioned, great latitude is to be accorded with the presentation of mitigating evidence. Nevertheless, the Rules of Evidence " 'also apply in this phase of the trial, * * *' " subject to specified exceptions. *Jenkins, supra,* at 171. It is readily apparent that none of those depicted was under oath during the videotape production. The prosecution had no involvement or opportunity to cross-examine the participants. Much of the commentary was conclusory with no evidentiary foundation. The trial court's ruling excluding appellant's Exhibit D was obviously aimed at the potential for unreliable and untrustworthy input in this fashion that would have little, if any, scrutiny by way of meaningful cross-examination, or contradictory submissions. There was no attempt by the appellant to summon or invite either appellant's mother or the former employer, each of whom was available, to testify before the jury at the sentencing hearing as to the matters contained in the videotape. It should be noted that those particular matters applicable to mitigation which were presented in the videotape were substantially included in the trial testimony of other defense witnesses, particularly the Reverend Howard K. Wells, and Mrs. Martha Lindsey. The narrator personally testified but only to those matters of which he was competent and had personal knowledge. Thus, no error occurred in disallowing the videotape.

Likewise, the trial court was fully justified in excluding or restricting the testimony of Reverends Wells and Mosely. These witnesses were not permitted to testify as to their opinion and philosophy regarding the imposition of the death penalty. They were not prevented from testifying to anything relating to appellant. To admit "this type of evidence would divert the jury from its duty to impose a sentence within the confines * * * fixed by statute" and would instead focus their attention on the "wisdom of enacting" the statutory penalty, which is "a matter within the province of the General Assembly." *Jenkins, supra,* at 190.

The psychiatric evaluation prepared for the mitigation phase concluded with the sentence: "In summary, within reasonable medical certainty, I do not see any imtigating [*sic*] circumstances in this particualr [*sic*] individual." This conclusion followed immediately after the medical examination paragraph. Appellant contends that the above statement constituted an unpermitted conclusion that there existed no mitigating circumstances. However, it is most apparent from the context of the statement, as well as the doctor's inclusion of the phrase "medical certainty," that the conclusion was intended to go no further than mitigating circumstances of a psychiatric nature.

Appellant contends that the inclusion of witness statements in the presentence report was error because the statements were unsworn and hearsay. The presentence report made upon the request of the defendant is required to be prepared and submitted to the jury, to the prosecutor and to the offender or his counsel. R.C. 2929.03(D)(1). Appellant made such request and the probation department was assigned the task of preparing the report. Presentence investigation reports for trials other than of aggravated murder, as provided for under R.C. 2947.06 and Crim. R. 32.2, are confidential, and utilized only by the trial court unless in the court's discretion such report is furnished to the defendant, or his counsel, and to the prosecuting attorney. Ordinarily, such reports may contain unsworn and hearsay information as they do not perform any evidentiary function. Although the presentence investigation report that may be made upon the request of one found guilty of aggravated murder is given to the jury for a review in the mitigation phase of the trial, such report is not considered to fall within the Rules of Evidence.[1] As in the case of the presentence reports in other criminal proceedings, the fact that such contained hearsay statements and were unsworn is not of itself a basis for a finding of error.

However, the inclusion of the witness statements in the presentence report is not without problems. Although R.C. 2929.03(D)(1) provides that the preparation and submission of this report to the jury is a right to which a defendant who is in the mitigation phase of an aggravated murder trial is entitled, very little in the way of guidance is provided as to how the report should actually be prepared or what specifics it should or should not contain. In the present case the investigating probation officer obtained police department records of witness investigations, prepared prior to trial. She specifically requested and obtained these reports from the prosecution. While great latitude is ordinarily granted the probation department's investigating officers to include relevant material, it should be noted that here considerable portions of the statements at issue contain statements which are irrelevant to either mitigating or aggravating circumstances. The combined effect of these statements tended to undermine the impartiality of the presentence report and constituted error. It would

---

[1] See Committee Comment to R.C. 2929.03 (Am. Sub. H.B. No. 511).

have been better procedure to have stricken the statements from the report.

The error in the report preparation was not, however, sufficiently grievous as to irrevocably taint the mitigation proceedings. The statements were from pretrial police interrogations of Ronald and Rocco Russo, Alseen Lanier, Otis Simmons, and Michael Pippin. All these witnesses testified at trial. While their written statements did not agree with their trial testimony in all respects, appellant retained a full right to call any of these witnesses and examine them as on cross in order to correct any discrepancies. Appellant did not exercise such rights or otherwise interfere with the jury's evaluation of the presentence report. Furthermore, on Monday, August 30, 1982, the trial court expressly offered appellant an opportunity to withdraw the probation report, which offer appellant refused.[2] Finally, and most importantly, as discussed *infra,* the aggravating circumstances outweighed the mitigating factors to such an overwhelming degree that it cannot be said that the included portions of the presentence report affected the mitigation phase of the trial.

Having completed the review of those issues raised upon appeal, it becomes necessary for this court to make the separate and independent analysis required by R.C. 2929.05.

The jury found that appellant committed the crime of aggravated murder with the aggravating circumstance specified in R.C. 2929.04 (A)(6) which states: "The victim of the offense was a peace officer * * * whom the offender had reasonable cause to know or knew to be such, and either the victim * * * was engaged in his duties, or it was the offender's specific purpose to kill a peace officer."

As previously considered, the victim was a peace officer. It was established at trial that the deputy was in full uniform when he was killed and was driving a clearly marked patrol cruiser. Therefore, "the offender had reasonable cause to know or knew" that the victim was a peace officer at the time of the killing.

There was testimony to the effect that Deputy Litch had been assigned to the transport duty by the sheriff's department. He was specifically assigned the task of transporting a prisoner to the hospital for treatment. Consequently, there was ample proof that he was "engaged in his duties."

There was also considerable evidence, both direct and circumstantial, that appellant had a "specific purpose to kill a peace officer." There was testimony that before the killing occurred, appellant had admitted his plan to free his half-brother and that he had knowledge of when his brother was to be transported. Appellant, therefore, had to assume that he would encounter one or more police officers.

---

[2] We do not here decide whether R.C. 2929.03(D) allows such withdrawal after the preparation of the report.

The execution-style killing of Deputy Litch demonstrated a clear, predetermined plan to kill the police officer. No effort was made to subdue the deputy. Appellant did not try to take him prisoner, knock him unconscious, or merely wound him. Instead, appellant selected a sawed-off, twelve-gauge shotgun as his assault weapon. He provoked the deputy into a vulnerable posture and, with no hesitation, fired at point-blank range into the deputy's heart. From this, the jury easily could have concluded that appellant had a specific purpose to kill a peace officer. Furthermore, reviewing this evidence we can determine that the trier of fact properly found appellant guilty beyond a reasonable doubt of a specification to aggravated murder pursuant to R.C. 2929.04(A)(6).

R.C. 2929.05(A) requires this court to weigh against the above aggravating circumstances any factors presented in mitigation as outlined in R.C. 2929.04(B). This latter section allows the court to weigh:

"[T]he nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

Items one, two, five and six as quoted above are not pertinent to the facts of this case. There is no evidence to demonstrate that the victim, under these facts, induced or facilitated the offense. Nor is there any showing that the offender was under duress, coercion, or strong provocation. The appellant was the principal offender. Therefore, item six is inapplicable. Finally, the appellant had prior experiences with law enforcement personnel, both as a juvenile and as an adult. Although different conclusions are tenable with respect to the seriousness of appellant's criminal record prior to this case, it cannot be said that appellant lacked any significant prior history.

Some evidence was presented to support those mitigating factors listed in items three and four. Appellant was twenty years old at the time

of trial and has had special educational needs. However, there is no indication that appellant suffered any mental disease or lacked substantial capacity to appreciate the criminality of his conduct. The presentence investigation does not reveal any of these factors as required in R.C. 2929.04(B)(3).

Appellant also introduced evidence as to his poor environment and background. Appellant was raised in an environment of poverty. He received little attention from his natural father. He had been truant and had educational and disciplinary problems as a boy. Appellant had extensive contact with his church when he was younger. He also required special education classes. However, this evidence as to appellant's age, family, background and environment is outweighed by the aggravating circumstances set forth above. See, *e.g.*, *State* v. *Martin* (1985), 19 Ohio St. 3d 122, 131-132. Moreover, those witnesses called had little, if any, exposure to appellant beyond the time when he was twelve years old.

Finally, this court is required to consider whether the sentence imposed was excessive or disproportionate to the penalty imposed in similar cases. R.C. 2929.05(A). We conclude that it is not excessive or disproportionate. See *State* v. *Barnes* (1986), 25 Ohio St. 3d 203, 212-213. Furthermore, viewing the record in its entirety in the context of previous aggravated murder cases, it can only be concluded that the sentence of death upon appellant is fully appropriate.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER, C. BROWN and DOUGLAS, JJ., concur.

CELEBREZZE, C.J., and WRIGHT, J., concur in paragraph one of the syllabus and the judgment only.