OPINION
Defendant-appellant, Jerry Bittner, appeals his convictions in the Clermont County Court of Common Pleas for child endangering and involuntary manslaughter.
Appellant's convictions stem from a tragic series of events that resulted in the death of his six-month-old daughter, Serena[1]
Bittner. On June 23, 1998, appellant, his wife (Bonnie Bittner), their infant daughter Serena, appellant's mother (Joan Bittner), appellant's two children from a previous relationship, and Bonnie's four children all lived in Joan's trailer in Goshen Township. Appellant was working two jobs to support his family. That afternoon, Bonnie and the children took Joan to work, went to a hardware store, and returned to the trailer at about 5 p.m. At 6:30 p.m., appellant came home from work to see his children before leaving for his second job. Not seeing Serena, he inquired as to her whereabouts. It was then discovered that Serena had been left in the van in the driveway. The temperature that day was eighty-four degrees Fahrenheit. Except for the front passenger window which was opened one to two inches, all the other windows were closed.
Serena was very hot, sweaty, clammy, and pale. She was "whizzing real bad" and "breathing hard." To cool her off, appellant had Serena and Bonnie take a lukewarm bath together. According to appellant, following the bath, Serena was no longer whizzing and sweating, showed no signs of distress, and drank a bottle of formula. Appellant and Bonnie talked for a brief moment about whether they should take Serena to the hospital, but decided instead to wait and see. Because of their prior involvement with county social services agencies, which resulted in the children being temporarily removed from them twice, appellant and Bonnie concocted a story that Serena's heat illness had been caused by her being left unattended on a bed where she covered herself in blankets and became overheated. Appellant denied the story was concocted to deceive the police. Rather, appellant testified that the story was concocted in case they would have to take Serena to the hospital. Appellant did not go back to work that evening in case they needed to go to the hospital.
Although Serena looked fine after the bath, she was still warm. Her temperature was then taken. Her temperature registered 101.8 degrees Fahrenheit. Bonnie then called a twenty-four hour nursing service for advice. She did not tell them that Serena had been left in a van, but rather that she had been found in a back bedroom. The nursing service advised them to give Serena "Tylenol for the fever," which they did. Serena thereafter fell asleep. At about 9 p.m., Serena felt warm and she was given more Tylenol. During the course of the evening, she drank more bottles of formula and slept on and off in Bonnie's arms. Appellant testified that Serena slept more than she was awake, and that when she was awake she would just lay there. Appellant also repeatedly testified that between her bath and her death, Serena looked fine.
Later that evening, appellant picked up his mother at the end of her 4 p.m. to 12:30 a.m. shift. While in the car, appellant told his mother that Bonnie had left Serena in the car, and that "if anybody asked, that the baby was left in [Joan's] bedroom." Specifically, appellant did not want his sister to find out that Bonnie had left Serena in the van. Once home, Joan looked at Serena and concurred that she looked fine. At about 2 a.m., Serena started shaking and stopped breathing. Appellant began performing CPR on Serena, which prompted her to throw up formula, and 911 was called.
Loretta Burns, a paramedic with the Goshen Township Fire Department and E.M.S., was dispatched to the scene and arrived there at 2:30 a.m. Burns testified that as soon as she stepped out of the ambulance, Serena was thrust at her. Burns noticed that Serena was warm to the touch, was cyanotic, and had no vital signs, that is, she was not breathing and had no pulse. Despite several attempts at reviving Serena, Burns never detected any vital signs in the child. Serena was eventually taken to the Bethesda North Hospital where she was pronounced dead. Robert Pfalzgraf, M.D., a pathologist with the coroner's office who performed an autopsy on Serena, ruled that the cause of death was hyperthermia due to exposure to excessive heat.
Edward Holland, a police officer with the Goshen Township Police Department, was dispatched to the scene. By the time he arrived at the scene, Serena, along with her parents, had already been taken to the hospital. At the scene, the officer obtained written statements from Joan and three teenagers, Darla Rash (appellant's daughter), Shawn Hayes, and Daniel Davis. All four persons told the officer that Serena had been placed in a back bedroom while the living room was being painted, and that she became overheated. Appellant and Bonnie told the same story to the police. The police eventually discovered that the story told by appellant and his relatives was not true. Appellant eventually admitted to the police that Serena had been left in the van and that is why she became overheated.
Appellant was indicted in March 2000 on one count of involuntary manslaughter in violation of R.C. 2903.04(A) and one count of child endangering in violation of R.C. 2919.22(A). A jury trial held on November 7-8, 2000 revealed the following additional facts:
 Appellant and Bonnie told Burns, the paramedic dispatched to the scene, that Serena was in Bonnie's arms when Serena gasped and stopped breathing. As previously noted, Serena had no vital signs and Burns was unable to detect any vital signs in the child. Burns testified that it would be unusual to arrive at a scene within ten minutes after an individual had stopped breathing and not be able to get any vital signs at all.
Shawn Hayes, a teenager who occasionally lived with appellant and his family, admitted that his written statement to the police describing how Serena had been left in a back bedroom while a room was being painted was not true. Although he could not remember who told him, Shawn testified that while they were waiting for the paramedics he was told by someone in appellant's family to tell the painting and back bedroom story to the police. Shawn also testified that during the course of the evening, Bonnie did not want to call 911 or go to the hospital. Shawn suspected that it was because of the family's prior involvement with county social services agencies. Shawn testified that he and appellant were both worried about Serena.
Tammy Armstrong, an investigator with Clermont County Children's Protective Services, met with appellant on June 24, 1998, the day Serena died. Appellant told her the painting and back bedroom story, how Serena became overheated after she covered herself with blankets, and how he and Bonnie treated Serena with a bath and bottles of formula. Appellant also told her how in hindsight he wished he would have taken Serena to the doctor. Armstrong testified that the children had been temporarily removed twice from appellant and Bonnie. Armstrong also testified that both appellant and Bonnie had been advised that any additional intervention by the agency due to neglect, dependency, or abuse allegations would result in their losing custody of their children.
Richard Montefiore, a social worker with Hamilton County Children's Services and the legal guardian of the children, testified that appellant told him that while they thought about contacting a doctor, they were concerned that any trip to a doctor or emergency room would possibly "re-involve [appellant] and Bonnie and the children with Children's Services in Clermont County." William Johnson, a lieutenant with the Goshen Township Police Department, similarly testified that appellant told him "one of the main reasons they did not call was because they were afraid that Children's Services would take their children." According to the officer, appellant also stated that he "knew that the child was in duress and was aware of the hazards of not sending the child to the doctor."
Joan admitted that her written statement to the police describing how Serena had been left in a back bedroom while a room was being painted was not true. Joan testified she lied to the police at appellant's request because he and Bonnie were afraid they would lose custody of their children. Joan denied telling Shawn, Darla, or Daniel what to write. Joan also testified that Serena did not show signs of distress, and that if she had she (Joan) would have called 911.
Dr. Pfalzgraf performed an autopsy on Serena. As previously noted, Dr. Pfalzgraf ruled the cause of death to be hyperthermia due to excessive heat exposure. Such ruling was based upon appellant's story to the physician that Serena was found "boiling hot," wrapped in blankets in a back bedroom with closed windows and no air conditioning. Dr. Pfalzgraf testified that the cause of death would be the same for a child who had been left in a vehicle parked in the sun for a period of time in excess of one hour with an outside temperature of eighty-four degrees Fahrenheit. Dr. Pfalzgraf also testified that appellant told him that while Serena seemed to respond to the bath, she nevertheless had a wandering left eye, and her left arm would twitch. Dr. Pfalzgraf testified he understood these symptoms had occurred during the time period between the bath and Serena's death. Dr. Pfalzgraf stated that excessive heat affects the function of the brain and the heart.
Robert Shapiro, M.D. is a physician at Cincinnati's Children's Hospital who sees children brought to the emergency room. Dr. Shapiro never saw Serena, but testified as an expert witness. Dr. Shapiro first explained the effect of heat exposure on people as follows:
 Excessive heat can lead to a number of problems and heat effect is usually greater in infants and in the elderly. This was an infant. The effects of overheating are related both to the degree of temperature elevation, as well as the length of time that an individual is exposed to high heat and then what happens afterwards. The most common type of heat symptom is something called a heat cramp[.] * * * After that comes something called heat exhaustion * * *. * * *
 The body can compensate for heat exhaustion by sweating, by getting rid of the excess heat, by breathing rapidly * * *. And an individual can compensate for that and correct that through drinking fluids and taking measures to reduce body temperature.
 If the heat condition is not stopped and whatever caused the initial overheating continues, the body will lose its ability to compensate. When dehydration occurs, * * * then the body can no longer sweat and when the body can't sweat and the temperature of the body goes up so that breathing becomes more difficult also, then the body — the body is a furnace on its own * * * — and so the temperature continues to rise and at that point permanent damage to different organ systems will occur and eventually death will occur.
Dr. Shapiro also explained that medical intervention can stop the foregoing process. Dr. Shapiro testified that every child he cared for in the emergency room because of a heat illness has recovered fully and done very well. With regard to Serena, Dr. Shapiro opined that at the time she was recovered from the van, she was suffering from heat exhaustion, she was "already pretty sick," and she did not receive the necessary corrective therapy. Had she received appropriate therapy, "the outcome would have been quite good." Dr. Shapiro stated that the child "progressed, instead of being corrected, down the path towards heat stroke and suffered from that." While Dr. Shapiro agreed that heat exhaustion treatments include cooling off a body and replacing fluids, he did not believe that giving a bath and bottles of formula would restore a baby to "normal appearing functioning." Dr. Shapiro also testified that a child who stops sweating is either near death or has recovered. Dr. Shapiro agreed that for a nonmedical person, the absence of sweat could be perceived as getting better.
Appellant repeatedly testified that following her bath Serena showed no signs of distress, and that is why they did not call 911 or go to a hospital during the course of the evening. Had he ever thought Serena was in distress, he would have taken her to the hospital. Appellant disputed Dr. Pfalzgraf's belief that the wandering eye and twitching arm occurred after the bath. Appellant testified that those symptoms occurred before the bath and that they stopped thereafter. Appellant denied telling Darla, Shawn, and Daniel to tell the painting and back bedroom story. Appellant testified he did not know who told them to tell that story. Appellant denied concocting the story to deceive the police. Appellant also testified he did not think he caused Serena's death.
At the conclusion of his jury trial, appellant was convicted as charged. He was sentenced to a one-year prison term for the child endangering conviction and to a four-year prison term for the involuntary manslaughter conviction. The trial court ordered the terms to be served consecutively. Appellant appeals, raising five assignments of error. Appellant's third and fourth assignments of error both involve the same issue, and therefore will be discussed together.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN QUESTIONING INDIVIDUAL JURORS ABOUT ALLEGED IMPROPER COMMENTS MADE BY DEFENDANT BITTNER IN THEIR PRESENCE PRIOR TO OPENING STATEMENTS BECAUSE THIS INQUISITION PREJUDICED THE JURORS AGAINST DEFENDANT BITTNER BEFORE THE TRIAL HAD EVEN BEGUN.
Following jury selection, but before opening arguments, the trial court received a report that while the jury was leaving for lunch that day, appellant was talking to another individual in the presence of one or more members of the jury. Because there was a distinct probability that at least one juror had overheard the conversation between appellant and the individual, the trial court decided to question each juror separately. The trial court thereafter asked each juror variations of the following questions:
 Q(1). Did you have a chance to overhear any conversations between any people on your way to lunch?
 Q(2). More specifically, did you have occasion to hear any conversation between the Defendant and any other person?
Although three jurors stated that they had seen appellant while they were leaving for lunch, all the jurors stated they had not overheard any conversation between appellant and the individual. Thereafter, the trial court instructed the jury as a whole not to talk to anybody involved in the case, and the trial began.
Appellant argues that "[i]n light of the timing of this inquisition by the trial judge and the failure to give any explanation of the purpose of asking these questions, this inquiry * * * created the impression that [appellant] may have said something to another party out in the hallway that was self-incriminating and that he was guilty of the charges being levied against him." Appellant asserts that the trial court should have dismissed the empanelled jury and selected a new jury. We disagree.
Generally, a trial court is "fully empowered to conduct the questioning of prospective jurors and may also direct such individual questions as [it] deems necessary." State v. Glenn (1986), 28 Ohio St.3d 451, 454, certiorari denied (1987), 482 U.S. 931, 107 S.Ct. 3219. "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror."State v. Phillips (1995), 74 Ohio St.3d 72, 88. "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror." Id. at 89.
The trial court's alleged prejudicial questions were made at a point when the court was examining each juror as to their exposure, if any, to appellant's pretrial conversation with another individual. The trial court's questions did not reveal the tenor of appellant's conversation with the individual, nor did they concern, even indirectly, appellant's guilt or innocence. We fail to see how the trial court's questions "implied [that appellant] was guilty from the outset and put him and his counsel in a position from which they could never hope to recover." Finding that the trial court's questions did not cast an aspersion upon appellant's innocence, we hold that, once the trial court became aware of appellant's conversation in the presence of at least one juror, it properly questioned each juror, and that it did not abuse its discretion in keeping the empanelled jury. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN ADMITTING THE WRITTEN STATEMENTS OF WITNESSES WHO WERE NOT PRESENT AT TRIAL AND NOT SUBJECT TO CROSS-EXAMINATION BY DEFENDANT BITTNER.
During its direct examination of Officer Holland, the state asked the officer to read the written statements he had obtained from Joan, Darla, Shawn, and Daniel while at the scene. All four statements related how Serena became overheated while left in a back bedroom. Defense counsel objected to the statements on the ground that they were hearsay. The state replied that the statements were not offered to prove the truth of the matter asserted, but rather to show how all four statements were consistent, and that there was some planning involved prior to the police arrival in concealing what had really happened.
The trial court overruled defense counsel's objection and allowed the officer to read all four statements. However, before the officer read the statements, the trial court instructed the jury that the statements were being offered not for the truth of the content but to explain the actions of this officer and his response to the statements given by the individuals from which he's going to read. * * * Further it's indicated the purpose of introducing the statements * * * are not for the truth of what was said but to show the alleged plan or purpose of the individuals making these statements.
After the officer was done reading the statements, the trial court again instructed the jury that the statements were not offered for the truth of the content but to indicate the individuals made the statements to the officer. While Darla and Daniel were unavailable to testify, Shawn and Joan did testify. The statements written by Darla and Daniel were not admitted in evidence as exhibits.
Appellant argues that Darla's and Daniel's statements were hearsay and that, as a result, their introduction into evidence violated his rights under the Sixth Amendment Confrontation Clause. Appellant asserts that as a result, "[t]he jury never had the opportunity to hear from Darla * * * and Daniel * * * that the story regarding where Serena was found was created to protect Bonnie Bittner from embarrassment for an absent minded mistake and a potential visit from Children's Services, not to deceive the police in any way."
It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v.Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Appellant admits that the right to confrontation does not necessarily prohibit the admission of hearsay statements against a criminal defendant. Idaho v.Wright (1990), 497 U.S. 805, 814, 110 S.Ct. 3139, 3146. Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) fall within a firmly rooted hearsay exception, or (2) bear adequate indicia of reliability. Id. at 814-815, 110 S.Ct. at 3146.
Upon a thorough review of the record, we find that Darla's and Daniel's written statements are not hearsay. Evid.R. 801(C) defines hearsay as "a statement other than one made by the declarant while testifying at the trial * * *, offered in evidence to prove the truth of the matterasserted." The record clearly shows that the written statements of Darla and Daniel were not offered to prove the truth of the matter asserted in the statements, that is, that Serena became overheated after having been left in a back bedroom. Rather, the statements were offered to show the consistency of the story told in all four statements, and that there was some planning involved prior to the police arrival in concealing what had really happened. As a result, their introduction in evidence did not violate appellant's rights under the Sixth Amendment Confrontation Clause.
In addition, while it is true the jury never had the opportunity to hear from Darla and Daniel themselves that "the story regarding where Serena was found was created to protect Bonnie * * * from embarrassment * * * and a potential visit from Children's Services, not to deceive the police in any way[,]" such reasons were nevertheless clear from the record. Indeed, several witnesses testified that the story was concocted to prevent involvement from county social services agencies. Moreover, appellant testified himself that the story was not concocted to deceive the police.
In light of all of the foregoing, we find that the trial court did not err by allowing Darla's and Daniel's written statements to be read into evidence. Appellant's second assignment of error is overruled.
Assignment of Error No. 3:
 THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT AS A MATTER OF LAW.
Assignment of Error No. 4:
 THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant argues that the evidence introduced at trial was insufficient to convict him and that his conviction was against the manifest weight of the evidence. Appellant claims that the state failed to show beyond a reasonable doubt that appellant acted recklessly once Serena was discovered in the van.
When reviewing the sufficiency of the evidence to support a criminal conviction, An appellate court's function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
In order for an appellate court to reverse a trial court's judgment on the basis that a jury verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact finder's resolution of any conflicting testimony. State v. Thompkins
(1997), 78 Ohio St.3d 380, 389. Specifically, The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
Id. at 387. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence.State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Appellant was convicted of involuntary manslaughter in violation of R.C. 2903.04(A), which states that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." Appellant was also convicted of child endangering in violation of R.C. 2919.22(A), which states in relevant part that "[n]o person, who is the parent * * * of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2901.01(H) defines "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."
The Supreme Court of Ohio has held that R.C. 2919.22(A) requires proof of a culpable mental state of recklessness as an essential element of the crime of child endangering. State v. McGee (1997), 79 Ohio St.3d 193, syllabus. R.C. 2901.22(C) provides that:
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
Parents have a legal duty to protect their children from harm. Statev. Sammons (1979), 58 Ohio St.2d 460, 463. The crime of child endangering under R.C. 2919.22(A) may be committed by acts of omission: "an inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A)." State v.Kamel (1984), 12 Ohio St.3d 306, 309.
After thoroughly reviewing the record, we find that once Serena was found in the van appellant acted recklessly, and that he created a substantial risk to the health of Serena. Serena, a six-month-old infant, was left in a van parked in the sun for a period of time in excess of one hour with an outside temperature of eighty-four degrees Fahrenheit. By the time she was discovered in the van, she was suffering from heat exhaustion and was "already pretty sick." Appellant repeatedly testified that had Serena been in distress, he would have taken her to the hospital. However, in appellant's own words, Serena was very hot, sweaty, clammy, and pale, and was "whizzing real hard" and "breathing hard" when she was recovered from the van. She was clearly in distress. She also had, at some point between her discovery in the van and her death, a wandering eye and a twitching arm. However, rather than call 911 or take her to the hospital appellant decided instead to give her a bath to cool her off. The record shows that at least twenty minutes elapsed between discovering Serena in the van and putting her in the bath.
Dr. Shapiro testified that medical intervention can stop the progression of heat illness, and that every child he had cared for in the emergency room because of a heat illness had recovered fully and done very well. Dr. Shapiro testified that had Serena received appropriate therapy, "the outcome would have been quite good." Instead, Serena "progressed, instead of being corrected, down the path towards heat stroke and suffered from that." Although appellant repeatedly testified that Serena looked fine after the bath, Dr. Shapiro did not believe that giving a bath and bottles of formula would restore a baby to "normal appearing functioning." In addition, while appellant testified that Serena was looking fine after the bath, the record shows otherwise.
Appellant testified that between 6:30 p.m. and her death Serena slept more than she was awake, and that when she was awake she would just lay there. Appellant also testified that Serena felt warm after her bath and again at 9 p.m. Appellant had another opportunity to fulfill his legal duty to protect his daughter from harm when the nursing service was called. It is doubtful Bonnie had to disclose her identity when she called the service. The truth as to where Serena was found could therefore have been related to the nursing service. Instead, as they had decided, Bonnie told the service that Serena became overheated in a back bedroom, and was advised to give Serena "Tylenol for the fever."
Shawn testified that Bonnie did not want to call 911 or go to the hospital. Appellant went along, and he and Bonnie concocted the story that Serena's heat illness had been caused by her being left unattended on a bed where she covered herself with blankets and became overheated. Appellant told a police officer that he knew it could be a life threatening situation, but that Serena was not in the van that long. Appellant also told the officer that he knew Serena was in distress and that he was aware of the hazards of not sending the child to the doctor. Yet, appellant and Bonnie were more concerned about county social services agencies being involved in their lives. It is abundantly clear from the record that, despite signs of distress displayed by Serena, appellant made the conscious decision not to seek medical attention in order to avoid an involvement from children's services which could result in their losing custody of their children and embarrassment for his wife. That decision ultimately caused Serena's death.
Appellant's actions undoubtedly created a substantial risk to his daughter's health which, in this unfortunate case, led to the child's death. Reviewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found that the elements of child endangering, including recklessness, were proven beyond a reasonable doubt. Moreover, our review of the evidence fails to persuade us that the jury lost its way and created a manifest miscarriage of justice. We therefore find that appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Appellant's third and fourth assignments of error are overruled.
Assignment of Error No. 5:
 DEFENDANT BITTNER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.
In determining whether a criminal defendant received ineffective assistance of counsel at trial, we apply the two-pronged analysis ofStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, the defendant must show that his counsel's actions were outside the wide range of professionally competent assistance. Second, the defendant must demonstrate that he was prejudiced by reason of counsel's actions. Id. at 687, 104 S.Ct. at 2064. Trial counsel's performance will not be deemed ineffective unless the defendant shows that "counsel's representation fell below an objective standard of reasonableness," id. at 688, 104 S.Ct. at 2064, and that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, 143, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258.
The defendant bears the burden of establishing both prongs before a reviewing court will deem trial counsel's performance ineffective.Strickland at 687, 104 S.Ct. at 2064. A properly licensed attorney is presumed competent. Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301. Any questions regarding the ineffectiveness of counsel must be viewed in light of the evidence against the defendant, Bradley at 142-143, with a "strong presumption that counsel's conduct falls within the wide range of professional assistance." Strickland at 689, 104 S.Ct. at 2065. A presumption exists that "under the circumstances, the challenged action `might be considered sound trial strategy.'" Id.
Appellant first argues he received ineffective assistance of counsel when his trial counsel failed to (1) object to the trial court's questioning of the jurors regarding appellant's conversation with another individual, and (2) ask for a jury instruction as to the purpose of the questioning. However, as we held under appellant's first assignment of error, the trial court did not abuse its discretion in questioning the jurors regarding the conversation and in keeping the empanelled jury. Therefore, trial counsel's failure to object to such questioning and to ask for jury instructions on the matter does not constitute prejudicial error for ineffective assistance of counsel.
Appellant also argues he received ineffective assistance when his trial counsel failed to call a medical expert witness. Appellant asserts the expert witness could have testified about the signs, symptoms, and treatment of heat exhaustion in infants, and could have elaborated on the confusion and mistakes in misreading symptoms of heat exhaustion in infants.
It is well-established that counsel's decisions concerning which witnesses to call at trial fall within the realm of trial strategy and tactics, State v. Coleman (1989), 45 Ohio St.3d 298, 307-308, certiorari denied (1990), 493 U.S. 1051, 110 S.Ct. 855, and generally will not constitute ineffective assistance of counsel. State v. Nicholas (1993),66 Ohio St.3d 432, 436. In addition, as previously noted, any questions regarding the ineffectiveness of counsel must be viewed in light of the evidence against the defendant. Bradley, 42 Ohio St.3d at 142-143. We note that although trial counsel did not call a medical expert witness to testify on appellant's behalf, trial counsel did briefly cross-examine Dr. Shapiro about treatments for heat exhaustion and how the absence of sweat in a child could be confused by a nonmedical person as getting better. The evidence presented at trial clearly established that Serena was in distress for twenty minutes before the bath, that she still had a temperature of 101.8 degrees Fahrenheit after the bath and felt warm at 9 p.m., that despite Serena's distress, appellant consciously failed to seek medical assistance to avoid involvement with county social services agencies and embarrassment for his wife, and that when medical assistance was finally sought by calling the nursing service, appellant's wife lied as to the cause of Serena's heat illness as they had previously agreed. In light of the evidence presented at trial, we find that appellant has not established that there is a reasonable probability that the outcome of his trial would have been different if his trial counsel had called a medical expert on his behalf.
Upon reviewing the record, we cannot say that appellant's trial counsel's performance fell below an objective standard of reasonableness or that, but for counsel's errors, the outcome of his trial would have been different. We therefore find that appellant has failed to establish that he received ineffective assistance of counsel. Appellant's fifth assignment of error is overruled.
YOUNG, P.J., and POWELL, J., concur.
[1] It is not clear what the proper spelling of the baby's first name is, as it is also spelled Sirenna and Sirrina in the record. We choose to use the spelling used in the state's bill of particulars, that is, Serena.