RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

JOHN J. ELEY,

*Petitioner-Appellant,*

*v.*

No. 06-4503

MARGARET BAGLEY, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 02-01994—Christopher A. Boyko, District Judge.

Argued: December 4, 2008

Decided and Filed: May 14, 2010

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** David Lawrence Doughten, LAW OFFICES, Cleveland, Ohio, for Appellant. Sarah A. Hadacek, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** David Lawrence Doughten, LAW OFFICES, Cleveland, Ohio, Jeffrey James Helmick, HELMICK & HOOLAHAN, Toledo, Ohio, for Appellant. Sarah A. Hadacek, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which SILER, J., joined. CLAY, J. (pp. 17-25), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

JULIA SMITH GIBBONS, Circuit Judge. Petitioner–appellant John J. Eley was convicted in Ohio of aggravated murder and aggravated robbery and sentenced to death. He now appeals the district court's denial of his petition for a writ of *habeas corpus*, challenging

1

the state trial court's failure to conduct a competency hearing, his trial counsel's effectiveness in developing mitigation evidence, and the trial panel's consideration of mitigation proof. For the reasons set forth below, we now affirm the district court's decision and dismiss Eley's *habeas* petition.

I.

The Ohio Supreme Court summarized the facts of the case as follows:

> During the early afternoon of August 26, 1986, Eley was visiting Melvin Green at the home of Green's girlfriend in Youngstown. According to Eley, he and Green were just sitting around when Green suggested that they go down to the "Arab store." Eley and Green left the house and proceeded down a path through the woods leading to the Sinjil Market. Along the way, Green showed Eley a "Black Snub nose gun," and told Eley he "was going to take the Arab off." Since the proprietor of the store, Ihsan Aydah, knew Green's face, Eley agreed to go in alone and rob the store while Green waited outside.
>
> Eley entered the store and told Aydah to put his hands up and to turn and face the wall. Green had told Eley that Aydah had a gun under the store counter, so when Aydah lowered his hands and went under the counter, Eley fired a shot. Eley claimed that he aimed at Aydah's shoulder. However, the shot hit Aydah on the right side of his head, approximately four inches above the earlobe. Aydah died the next day of shock and hemorrhage due to a gunshot wound to the head.
>
> Just before Eley fired the gun, Green entered the store. After the shot, Green ran behind the counter and got into the cash register. He took Aydah's wallet while Aydah lay wounded on the floor. As the two left the store, Green gave Eley a brown paper bag with the money and wallet. According to Eley, they went up the street, "got to the path and run up the woods."
>
> . . .
>
> Several days after the murder, Eley was arrested by Youngstown police at the residence of his cousin's girlfriend, Carlotta Skinner. After his arrest, Eley told police that he and Green had split the money taken in the robbery, which was around $700. However, Eley later gave the money back to Green "because he said it was all on him and he had to get out."
>
> . . .
>
> [After being arrested, i]n his voluntary statement Eley admitted that he and Green had robbed the Sinjil Market, and that he shot Aydah. [The arresting officer] testified that Eley did not appear to be under the influence of alcohol or drugs during the interview and was "very calm" and "passive."
>
> The grand jury indicted Eley on one count of aggravated murder with a specification that the murder was committed during, or immediately after, the commission of an aggravated robbery (R.C. 2929.04[A][7]), and

that Eley was the principal offender.  This count also carried a firearm specification.  In addition, Eley was indicted on one count of aggravated robbery (R.C. 2911.01[A][1] and [2]) and one count of conspiracy (R.C. 2923.01[A]).  Each count carried a firearm specification.

In May 1987, Eley waived his right to a jury trial and opted for a trial before a three-judge panel.  Eley pled not guilty to the charges against him, thereby withdrawing a prior plea of not guilty by reason of insanity. . . .[1]

Trial was held before a three-judge panel on May 11–12, 1987, but the defense chose not to present any evidence.  The panel found Eley guilty of aggravated murder, aggravated robbery, the felony-murder capital specification, and two of the three firearm specifications, but not guilty of conspiracy.

During the mitigation hearing, several family members testified on Eley's behalf.  Eley's mother, Cecilia Joseph, divorced Eley's father when Eley was seven or eight years old, and stated that Eley had "not much" of a relationship with his father.  Joseph testified that on Christmas night 1964, her second husband had been drinking and began choking her and her daughter.  At that time, Eley stabbed the second husband with a knife in order to stop him.  Joseph testified that Eley dropped out of high school in the ninth grade, but later entered the Job Corps and learned to be a welder.  Eley sent money home to his mother during this time, and gave her money to help her finish paying for nursing school.  Joseph stated that while Eley has had problems with drugs and alcohol, he is a better person when he is not under the influence.  She characterized Eley as "church oriented," and believed he had been "born again."

Eley's sister, Susan Laury, testified that Eley had helped the family financially while he was in the Job Corps, and that Eley is normally a "quiet, sweet, gentle person that wouldn't hurt anybody."

Dr. Douglas Darnall, a clinical psychologist, found Eley to be of borderline intelligence, and ranked him in the twelfth percentile on the Wechsler Adult Intelligence Test.  According to Darnall, Eley has a history of chronic alcohol and polysubstance abuse, but exhibited "no evidence of psychosis or major defective disorder."  In addition, Darnall testified that Eley understands the difference between right and wrong.  Darnall found Eley to be remorseful, but Eley never mentioned that he felt remorse for the victim.  However, two police officers who witnessed Eley's confession testified that Eley was remorseful before he made that statement.  Eley made a short unsworn statement at the mitigation phase that consisted of several biblical quotations from the Book of Romans.

---

[1] According to an affidavit of trial counsel, before trial Eley refused to accept various plea offers that were conditioned on Eley's testimony against Green, including an offer of a voluntary manslaughter charge with a six-year sentence.

> After deliberation, the panel unanimously found that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt, and sentenced Eley to death. Upon appeal, the court of appeals affirmed the convictions and sentence of death.

*State v. Eley*, 672 N.E.2d 640, 644–46 (Ohio 1996). After considering the eighteen issues Eley raised on appeal, the Ohio Supreme Court affirmed the judgment of the court of appeals. *Id.* at 654. Eley's petition for a writ of certiorari to the Supreme Court was denied. *Eley v. Ohio*, 521 U.S. 1124 (1997).

Eley filed a petition for post-conviction relief under Ohio Revised Code § 2953.21 on September 20, 1996. The state court conducted an evidentiary hearing on Eley's competency but denied Eley's motion for a competency determination on the ground that he had no right to be competent in a post-conviction proceeding. The court then denied post-conviction relief on April 1, 1999. *State v. Eley*, No. 86-CR-484 (Ohio Ct. Com. Pl. Apr. 1, 1999). Eley timely appealed, but the Seventh District Court of Appeals affirmed the trial court's dismissal of the post-conviction petition on November 6, 2001. *State v. Eley*, No. 99-CA-109, 2001 WL 1497095 (Ohio Ct. App. Nov. 6, 2001). The Ohio Supreme Court declined to exercise jurisdiction over Eley's post-conviction petition. *State v. Eley*, 764 N.E.2d 1036 (Table) (Ohio 2002).

On July 12, 2002, Eley's sister, Susan Laury, filed a notice of intent to file the present petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, along with motions to stay Eley's execution, to appoint counsel, and for a competency evaluation to determine if Eley was competent to waive any further appeals. The district court entered a stay, but while the parties were briefing the last two motions, Eley filed a notice of intent to file a *habeas* petition himself. Eley filed the petition on March 19, 2003, raising fourteen grounds for relief. *See Eley v. Bagley*, No. 4:02CV1994, 2006 WL 2990520, at *4 (N.D. Ohio Oct. 18, 2006). In November 2003, Eley filed a motion to stay the *habeas* proceeding so that he could file a mental retardation claim in state court pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). This claim was later denied. On October 16, 2006, the district court denied his *habeas* petition on all fourteen grounds. *Eley*, 2006 WL 2990520.

Eley timely appealed and now raises three issues. The district court granted a Certificate of Appealability ("COA") as to the first two: (1) whether the trial court violated Eley's due process rights by failing to hold a competency hearing; and (2) whether Eley's trial counsel was constitutionally ineffective by failing to investigate or prepare mitigating evidence for the penalty phase. We expanded the COA to include: (3) whether the three-judge trial panel failed to consider and give effect to valid mitigation evidence at sentencing.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs all *habeas* petitions filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997). AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A state court adjudication is "contrary to" Supreme Court precedent under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court makes "an unreasonable application of" Supreme Court precedent under § 2254(d)(2) "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case," or if the court unreasonably extends or refuses to extend existing Supreme Court precedent to new

factual situations where it should apply. *Id.* at 407. Under AEDPA, the question for this court to answer "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Factual findings made by the state courts based on the trial record are entitled to a presumption of correctness that may be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998).

However, federal courts need not review every point of error raised by a *habeas* petitioner. When a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this circuit, to determine whether a federal claim has been procedurally defaulted, we apply a three-prong test laid out in *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986):

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . .

*Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138). If the state procedural rule was not complied with and that rule was an "adequate and independent" ground for default, we may still excuse the default if the petitioner can demonstrate "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138. In *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982), "the Ohio Supreme Court held that res judicata is a proper basis upon which to dismiss an ineffective-assistance claim in a petition for post-conviction relief where a defendant who is represented by new counsel on direct appeal fails to raise that claim and the basis for that claim 'could be fairly

determined without examining evidence outside the record.'" *Fautenberry v. Mitchell*, 515 F.3d 614, 633 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008). In *Fautenberry*, we held that "Ohio's application of res judicata pursuant to *Cole* is an actually enforced, adequate and independent state ground upon which the Ohio state courts consistently refuse to review the merits of a defendant's claims." *Id.*

## III.

### A.

We first address Eley's claim of deprivation of due process by the state trial panel's failure to conduct a competency hearing. "The due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence that a defendant is incompetent." *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006) (citing *Pate v. Robinson*, 383 U.S. 375, 385–86 (1966)). A defendant can be adjudged competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri*, 420 U.S. 162, 180 (1975).

Eley argues that there was significant evidence of his incompetency at trial and therefore the three-judge trial panel should have held an evidentiary hearing on his competency, even after his counsel withdrew a request for one. Eley points to various facts in the record to support this assertion. In depositions and affidavits taken to support his state post-conviction petition, Eley's trial counsel reported that Eley often rambled about abstract religious ideas instead of cooperating with forming a defense. They further stated that Eley often had difficulty communicating with counsel because of his below-average intelligence and education. At the penalty phase of trial, Eley's unsworn statement to the court was a series of biblical quotations from the Book of

Romans.  Eley contends that his mental incompetence directly resulted in his refusal to accept a plea offer that would have resulted in his serving six years in prison.  During his post-conviction proceedings, the Ohio post-conviction trial court held a competency hearing, at which Dr. Jeffrey Smalldon, a clinical psychologist, testified that Eley was inclined to make "pseudophilosophical statements that were often couched in religious terms, often very difficult to understand."  Smalldon also suspected that Eley may have suffered from brain damage—possibly due to having had a forceps delivery, to his abusive upbringing, or boxing as an adolescent—although due to Eley's failure to cooperate, Smalldon could not confirm any of his suspicions.  Eley contends now that there was sufficient evidence to give the trial judges cause to suspect that he was incompetent to stand trial.

The Ohio Supreme Court considered and rejected this argument.  The court first held that Eley had waived his right to a competency hearing "knowingly and intelligently" after having requested one.  *Eley*, 672 N.E.2d at 650.  This holding is problematic.  As the Supreme Court warned in *Pate v. Robinson*, "[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."  383 U.S. at 384.  However, in the alternative, the Ohio Supreme Court held that even if the waiver were invalid, "any error by the trial court in not conducting a hearing was harmless, since the record fails to reveal sufficient indicia of incompetency."  *Eley*, 672 N.E.2d at 650.  According to the court, Eley had failed to cite any portion of the record that revealed "any suggestion of incompetency."  *Id.*

Because evidence at trial did not suggest that Eley was incompetent, we cannot find that the Ohio Supreme Court's decision on this issue was unreasonable.  The test for whether the trial court erred in not holding a proper hearing is whether a reasonable judge in that position would have "experienced doubt with respect to competency to stand trial."  *Filiaggi*, 445 F.3d at 858.  The state trial record reveals the following.  During a suppression hearing held less than a week before trial, Eley testified to his recollection of the confession he gave police.  His answers on both direct and cross-

examination were cogent and show that he had an understanding of his objective at the hearing. Nothing in the record suggests Eley was incompetent during the guilt phase of trial. At the penalty phase, Eley gave a brief, unsworn statement that consisted of nothing but Bible verses. While the statement was perhaps unusual, it does not suggest a lack of competency. Nor does the penalty phase testimony about Eley's limited education and low intelligence suggest that Eley was incompetent. Moreover, the state trial court was aware of Darnall's opinion that Eley was competent to stand trial.

Much of the evidence that Eley provides to suggest his lack of competency was generated nearly a decade after his trial. For example, in preparation for his state post-conviction action, Smalldon reported that Eley may have had brain damage due to head injuries suffered during Eley's youth. Further, Smalldon reported that he was unable to obtain hard test data to corroborate various opinions he had formed because Eley was uncooperative during his examination. Smalldon's report was not made until 1996, and he did not testify at a hearing until January 1997, roughly a decade after the trial. Although Smalldon believed that many of the factors that led him to his conclusions "perhaps" would have affected Eley in the same way at the time of trial, he was only able to conclude that there were serious questions about Eley's competency "at present," meaning in 1996–1997. Smalldon's assessments did not speak to Eley's competency *at the time of trial*, which is the relevant legal inquiry. For similar reasons, depositions from Eley's trial counsel during post-conviction proceedings indicating counsel's frustration with Eley's uncooperative nature and religious beliefs during trial do not satisfy the test laid out in *Filiaggi*.

Retroactive determinations of competency are difficult, and any such determination must be based on "'evidence derived from knowledge contemporaneous to trial.'" *Bowers v. Battles*, 568 F.2d 1, 4 (6th Cir. 1977) (quoting *Connor v. Wingo*, 429 F.2d 630, 637 (6th Cir. 1970)). The evidence proffered by Eley from the state post-conviction proceedings has virtually no probative value. The psychological evaluation of Eley performed by Darnall just before Eley's sentencing hearing, which concluded he was sane and competent, is far more probative of his competency at trial than

examinations conducted nearly ten years later. Although the Ohio Supreme Court's holding was that the failure to conduct a competency hearing "was harmless," the decision was still based on the critical finding that "the record fails to reveal sufficient indicia of incompetency." *Eley*, 672 N.E.2d at 650. This finding did not involve an unreasonable application of clearly established Supreme Court precedent, and we therefore affirm the district court on this issue.

### B.

Eley's second claim is that his counsel performed ineffectively by failing to investigate and present adequate mitigating evidence at the penalty phase. He argues that his counsel relied too heavily on the Presentence Investigation Report ("PSR") and therefore decided not to interview much of Eley's family. Eley also argues that counsel failed to present important social history evidence, such as his difficult upbringing, history of alcohol and drug abuse, and employment background. Further, Eley contends that his defense was further undermined by counsel's failure to request an independent psychological evaluation by a qualified mitigation psychologist. According to Eley, counsel's failures resulted in the state courts' not fully considering potentially mitigating factors such as his true remorse for his actions or possible mental defects.

The district court found that Eley had not raised any of these arguments until his state post-conviction petition, where the Ohio court held that the claims were barred by *res judiciata*. *Eley*, 2006 WL 2990520, at *28. Therefore, the district court held that this claim was procedurally defaulted. *Id.* A review of the state court opinions reveals this is only partially true. The state post-conviction court found that only a portion of Eley's claim—that counsel was ineffective for not hiring a toxicologist or pharmacologist—was barred by *res judicata* because it was not based on evidence outside the record and therefore could have been raised on direct appeal. *Eley*, 2001 WL 1497095, at *10. However, the court of appeals did reach the rest of Eley's ineffective assistance claim on the merits and found that he had not shown that any evidence uncovered by further investigation would have not been cumulative to the evidence

disclosed in the PSR.  *Id.* at \*9, \*12.  Therefore, we review the rest of his claim of ineffective assistance of counsel on the merits.**2**

The Supreme Court set forth the test for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish this claim, Eley must show (1) that his counsel's performance was deficient, and (2) that the deficiency prejudiced his defense.  *Id.* at 687–88.  To prove deficiency, Eley must show that "counsel's representation fell below an objective standard of reasonableness."  *Id.*  Prejudice can be shown by proving "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Counsel's failure to reasonably investigate a defendant's background or present mitigating evidence to the jury at sentencing can constitute ineffective assistance.  *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003); *Williams*, 529 U.S. at 395–96.

When assessing whether an attorney's mitigation investigation was deficient, we consider "not only the quantum of evidence already known to counsel," but also whether that evidence should have led "a reasonable attorney to investigate further."  *Wiggins*, 539 U.S. at 527.  To demonstrate prejudice, Eley must show that any new evidence differs "in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing."  *Fautenberry*, 515 F.3d at 626 (citation and internal quotation marks omitted).  "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation."  *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007) (quoting *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)) (internal quotation marks omitted).  The Ohio Court of Appeals's treatment of this claim hinged on this last issue—the court found that Eley could not show the new evidence he proffered was more than merely cumulative of what was presented at mitigation.  Ohio lists the "history, character, and

---

**2** "Out of an abundance of caution," the district court did reach the merits of this claim in the alternative and rejected it.  *See Eley*, 2006 WL 2990520, at \*28–31.

background" of the offender as a statutory mitigating factor. Ohio Rev. Code Ann. § 2929.04(B).[3] Therefore, the facts Eley claims counsel should have presented could be probative of further mitigation.

At the mitigation hearing, Eley first offered the testimony of several law enforcement officials. A sergeant with the Mahoning County Jail testified that Eley had not violated any rules or regulations before or during trial. Two officers with the Youngstown Police Department testified that Eley appeared remorseful at the time he admitted responsibility for his actions. Eley's mother, Cecilia Joseph, and sister, Susan Laury, testified that Eley had difficulty with school and dropped out when he was sixteen years old. Eley then enlisted in the Job Corps and received training to be a welder, and Joseph and Laury testified that Eley sent his mother money to support her training for a nursing degree. Joseph testified that Eley was church-oriented and often attended church near her home. Joseph and Laury both testified to Eley's poor relationship with his father and step-father. Once Eley's father and mother divorced, when Eley was around fourteen, Eley's father stopped seeing him. One Christmas, Joseph's second husband—Eley's step-father—became violent with Joseph and Laury. Eley attempted to stop his step-father from strangling his mother by stabbing him. Joseph and Laury testified that although Eley was typically a quiet, sweet, and gentle person, his habitual use of drugs and alcohol often led to his becoming a different person when he was impaired. Darnall, a state psychologist and witness, testified that Eley had a chronic history of both alcohol and polysubstance abuse.

In the state post-conviction proceeding, Eley presented additional mitigating evidence that counsel had failed to uncover at his sentencing hearing. Joseph testified that Eley underwent a forceps delivery at birth. A former girlfriend testified that Eley was addicted to heroin in the 1970s and had been a binge drinker. Eley's step-mother testified she knew Eley had been "eating aspirin" as early as the second or third grade. Eley's younger sister testified that the family rarely ate nutritional meals when Eley was

---

[3]Although the statute has undergone a minor stylistic change, the version in effect in 1987, when Eley was sentenced, is in all relevant respects identical to the present version. *See, e.g.*, *State v. Glenn*, 564 N.E.2d 701, 711 (Ohio 1986).

growing up, which she believed may have affected him later in life. Several witnesses testified that Eley became violent or belligerent when he was drinking.

The Ohio Court of Appeals recounted the applicable standard under *Strickland*. It wrote that although "[i]t is the obligation of counsel to make reasonable investigations . . . [a] particular decision not to investigate must be examined for reasonableness under the circumstances with strong measures of deference to counsel's judgments." *Eley*, 2001 WL 1497095, at *9. After reviewing the evidence presented at the sentencing phase of trial, the court concluded that "a quantum of information contained in the affidavits appears to be repetitive of evidence presented by trial counsel at the mitigation stage." *Id.* As for the evidence of a forceps delivery, the court found this evidence to be "of the type that would normally be rejected by three judge panels when weighing mitigating factors." *Id.* Therefore, the court concluded that Eley had shown no prejudice. *Id.* Later, when discussing trial counsel's alleged overreliance on the PSR, the court repeated its prior conclusion that counsel's behavior was "not unreasonable considering the fact that [the PSR] uncovered similar evidence that would have been uncovered had a specific investigation been conducted." *Id.* at *12.

We cannot find that this conclusion was an unreasonable application of federal law. The record shows that counsel prepared and questioned several witnesses, including both law enforcement and family. The question of whether counsel conducted an "adequate investigation" is governed by a "'presumption of reasonableness imposed by *Strickland* [and is] hard to overcome.'" *Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008) (quoting *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001)). To the extent that trial counsel failed to further investigate Eley's upbringing or history of drug and alcohol abuse—that is, to the extent counsel's performance was deficient—Eley cannot show that this failure prejudiced his ability to prove mitigating circumstances. Although the evidence presented at the post-conviction hearing did go into more depth than the evidence presented by trial counsel at sentencing, it did not cover any new subject matter and was not substantially more persuasive than the trial evidence. Much of what Eley claims should have been presented at the sentencing hearing was, in fact, presented, as

counsel elicited testimony regarding Eley's difficult upbringing, employment history, drug and alcohol addictions, and good behavior in prison. Therefore, we find that Eley's second claim is without merit, and we affirm the judgment of the district court on this issue.

## C.

Finally, Eley claims that his Eighth and Fourteenth Amendment rights were violated by the three-judge trial panel's failure to properly consider valid mitigation evidence at sentencing. He maintains that the panel did not consider the evidence he presented regarding his difficult upbringing, his history of drug and alcohol abuse, his low intelligence level, and his remorse for the crime.[4] Eley supports this claim by noting that the panel's discussion of mitigating factors in its sentencing opinion is devoid of any mention of this evidence. He argues that "[t]he fact that the three-judge panel . . . did not mention any of the previously noted evidence in mitigation is strong evidence that such factors were not properly considered." Therefore, according to Eley, when the trial judges excluded the evidence from their consideration, they violated the Supreme Court's ruling in *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Further, Eley argues that the omission of reference to the evidence violates Ohio Rev. Code Ann. § 2929.03(F),[5] which sets forth the content required in a sentencing opinion, thus violating his due process rights under *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

In *Lockett v. Ohio*, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be

---

[4]Eley also claims the court should have considered that he was under strong duress when he committed the crime, that he cooperated with law enforcement, and that he had undergone a religious conversion since the homicide. However, Eley did not fairly present these sub-claims to the state courts, and he is therefore barred from raising them here. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Leroy v. Marshall*, 757 F.2d 94, 97 (6th Cir. 1985).

[5]Ohio Revised Code § 2929.03(F) states in relevant part:

The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S 586, 604 (1978). In that case, the Ohio death penalty statute did not permit the sentencing judge to consider factors such as the defendant's character, prior record, and age. *See id.* at 597, 606, 608. The Court extended this holding in *Eddings*; just as the statute may not restrict certain factors from being considered as mitigation, the sentencing judge cannot, as a matter of law, refuse to consider appropriate evidence either. 455 U.S. at 108–09, 114–17. "The sentencer[s] . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114–15.

If a trial court considers unconstitutional aggravating factors, the Supreme Court has held that this error can be cured by the state appellate court "by independently 'reweighing' aggravating and mitigating factors and reaching a sentence without the consideration of the factors found impermissible at the trial level." *See Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006) (citing *Clemons v. Mississippi*, 494 U.S. 738, 740 (1990)).

In this case, Eley is correct that the trial court's sentencing opinion is somewhat sparse in its analysis of the mitigation evidence.[6] However, Eley's conclusion that the court's lack of detail amounts to a refusal, *as a matter of law*, to consider any of his mitigating evidence is not logical. Although the trial court did not elaborate on the precise evidence it had considered, its opinion does state that it gave careful and complete scrutiny of all the mitigating factors, which implies at least that it did not

---

[6]The extent of the trial court's analysis was quite limited. The court first quickly recounted each category of mitigating factor provided by statute and summarily concluded that none of them applied to Eley's case. It then concluded:

> Upon full, careful and complete scrutiny of all the mitigating factors set forth [*sic*] in the statutes or called to the Court's attention by defense counsel in any manner and after considering fully the aggravating circumstances, which exist and have been proven beyond a reasonable doubt, the Court concludes that the aggravating circumstances do outweigh all the mitigating factors, advanced by the Defendant, beyond a reasonable doubt as is required by [Ohio Rev. Code Ann. §] 2929.03(D)(3).

*State v. Eley*, No. 86-CR-484, at 4 (Ohio Ct. Com. Pl. July 21, 1987).

explicitly *refuse* to consider relevant evidence. As the Ohio Court of Appeals noted, and as recounted above, the trial court heard evidence on all of the mitigating factors that Eley claims were absent from its consideration. *See State v. Eley*, No. 87 CA 122, 1995 WL 758808, at *5–6 (Ohio Ct. App. Dec. 20, 1995).

Moreover, even if the trial court did err in its weighing of the aggravating and mitigating factors or by not following Ohio statutory procedural requirements, both the Ohio Court of Appeals and the Ohio Supreme Court cured the error by carefully and independently reweighing the evidence. The court of appeals considered not only the mitigation evidence Eley claims was ignored, but it also considered additional evidence of Eley's head injuries, the possibility of residual doubt, the fact that Eley's co-defendant went unpunished, whether the prosecution committed misconduct, and whether the trial court improperly admitted gruesome photographs. *Id.* at *24–26, *29–30. The court of appeals concluded that "the aggravating circumstance [Eley] was found guilty of committing outweighs the mitigating factors in this case." *Id.* at *30. The Ohio Supreme Court did the same thing. It found "nothing in the nature and circumstances of the offense to be mitigating [because] Eley participated in a robbery where, under the circumstances, a murder was likely to occur." *Eley*, 672 N.E.2d at 653. It found Eley's history, character, and background to be entitled to only "modest weight." *Id.* The court gave "some weight" to Eley's "longstanding devotion and care for his family" and the fact that "Eley has shown remorse." *Id.* at 654. Nonetheless, the Ohio Supreme Court also concluded that "the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt." *Id.*

Because, under *Baston v. Bagley*, 420 F.3d 632, 637 (6th Cir. 2005), any defect in the trial court's sentencing was cured by the appellate courts' reweighing of the evidence presented on direct appeal, we affirm the district court on this issue.

IV.

For the reasons set forth above, we affirm the judgment of the district court and dismiss Eley's petition for a writ of *habeas corpus*.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.   Petitioner's counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to adequately investigate and prepare mitigating evidence for the penalty phase of Petitioner's trial. I would therefore vacate Petitioner's sentence and remand for proceedings consistent with this opinion.[1]

To establish that counsel was ineffective at the penalty phase under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), Petitioner must show that: (1) counsel's performance was deficient, and (2) the deficiency prejudiced his defense.

## I.  Trial Counsel's Deficient Performance[2]

Because the Ohio Court of Appeals analyzed Petitioner's ineffective assistance claim only under the prejudice prong of *Strickland* and did not determine whether Petitioner's counsel's investigation constituted deficient performance, this Court examines this element of Petitioner's claim *de novo*.  *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).  To demonstrate that counsel was deficient, Petitioner must establish that "counsel's representation fell below an objective standard of reasonableness," measured against "prevailing professional norms."  *Strickland*, 466 U.S. at 688.

With respect to representation at the penalty phase of capital cases, the Supreme Court has referred to the American Bar Association ("ABA") Guidelines concerning death penalty cases as "'guides to determining what is reasonable.'"  *Rompilla*, 545 U.S. at 387 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466

---

[1] Petitioner has failed to make a sufficient showing on his claims that the state trial court's failure to conduct a competency hearing violated his due process rights and that the state trial court's refusal to consider mitigating evidence violated his Eighth or Fourteenth Amendment rights.  Thus, this dissent will not address these claims.

[2] Because I agree with the majority that Petitioner's claim of ineffective assistance of counsel is not procedurally defaulted–except as to Petitioner's claim that counsel was ineffective for failing to hire a toxicologist or pharmacologist, which is not at issue here–I have proceeded directly to the merits of Petitioner's claim.

U.S. at 688)). *See also Bobby v. Van Hook*, 130 S. Ct. 13, 16 (2009) (noting that "[r]estatements of professional standards [such as the ABA Guidelines] can be useful as 'guides' to what reasonableness entails . . . to the extent they describe the professional norms prevailing when the representation took place"); *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) ( noting that the Supreme Court has held that "the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases"). According to the ABA Guidelines, in capital cases, "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 534 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in original). The Court has further noted that "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* (emphasis omitted).

Although decisions regarding the investigation of mitigating evidence often involve strategic choices, counsel's strategic decisions must be supported by a "thorough investigation." *Strickland*, 466 U.S. at 690. When counsel decides to limit their mitigation investigation, their strategic choices made after this limited investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. Accordingly, "the deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments." *Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir. 2008) (citing *Wiggins*, 539 U.S. at 521). "In assessing the reasonableness of [attorneys'] investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead . . . reasonable attorney[s] to investigate further." *Wiggins*, 539 U.S. at 527. However, the Supreme Court has also instructed that "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy

measure of deference to counsel's judgments.'"  *Rompilla*, 545 U.S. at 382 (quoting *Strickland*, 466 U.S. at 689, 691) (citations omitted).

On appeal, Petitioner argues that his trial counsel were ineffective during the penalty phase of his trial in several ways.  First, Petitioner maintains that "counsel were ineffective in their mitigation investigation in that they did not talk to most of [Petitioner's] family."  (Pet.'s Br. at 25).  With respect to those family members with whom counsel spoke, Petitioner argues that trial counsel failed to "adequately investigate and prepare" them prior to the mitigation hearing.  (*Id.*)  Petitioner also faults trial counsel for relying on a pre-sentence investigation report without performing further investigation.

The record, including the testimony of witnesses during mitigation and the post-conviction deposition of John Schultz, one of Petitioner's trial attorneys, shows that Petitioner's attorneys consulted Petitioner's family, Dr. Darnall, and another mental health expert, Dr. Morrison.  They also reviewed the Adult Parole Authority's pre-sentence investigation report and requested a pre-sentencing psychological examination, although they did not review any of Petitioner's medical or school records.  Schultz testified that, "in hindsight," he "probably would have hired a mitigation expert to assist him," (J.A. at 910), but noted that mitigation was "relatively new" and not many lawyers were experienced in it at the time of Petitioner's trial.  (J.A. at 879).

From these sources, counsel knew the following: (1) Petitioner had a history of difficulty in school and was a "slow learner" with a low I.Q. and at times had trouble communicating with people; (2) Petitioner was generally a nice and non-violent person who helped family around the house and got along well with children; (3) Petitioner had a poor relationship with his step-father and had at one point stabbed him when his step-father attempted to choke both his mother and sister in a drunken rage; (4) Petitioner had several juvenile incidents, including a knife fight and, as an adult, had numerous convictions for theft, assault, breaking and entering, and "drunk and disturbance;" and (5) Petitioner had a history of serious drug and alcohol abuse.

At mitigation, Petitioner's counsel presented six witnesses, including two detectives who indicated that Petitioner was remorseful and one correctional facility officer who testified regarding Petitioner's good behavior while incarcerated. Each of these witness' testimony takes up less than three pages in the sentencing transcript. Although it appears counsel may have spoken to at least two additional family members, counsel indicated that their testimony was "largely indicative" of the testimony already offered. (J.A. at 1587).

Based on the affidavits submitted by Petitioner's other family members and acquaintances, however, it appears that trial counsel failed to contact several family members and friends. *See Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008) (concluding that counsel's failure to interview the petitioner's mother constituted deficient performance because the interview could have provided further information as to how her own drug addiction affected the petitioner's childhood). The record fails to indicate that Petitioner's counsel asked for additional names from Petitioner's mother, sister, and brother-in-law, or from state officials who were familiar with Petitioner as a result of Petitioner's contact with the criminal justice system. *See id.* (highlighting counsel's failure to ask witnesses who were interviewed for additional sources of mitigation witnesses in finding that counsel was deficient). Nor did counsel seek to contact officers who were involved in the preparation of Petitioner's pre-sentence report or his case more generally.

Counsel also did not seek the court's permission to retain a mitigation expert. While counsel's failure to use a mitigation expert itself does not constitute deficient performance, their failure to obtain the information that a mitigation expert would gather—information regarding Petitioner's childhood, early school years, substance abuse, interactions with family, and contact with the criminal justice system—demonstrates the deficiency of counsel's performance. *See Jells*, 538 F.3d at 495 (citing *Williams v. Taylor*, 529 U.S. 362, 397 (2000)) (concluding that counsel had "an obligation to fully investigate the possible mitigation evidence available"). "Counsel's decision not to expand their investigation" and to rely on the pre-sentence

investigation report to fulfill this obligation to investigate was objectively unreasonable. *Wiggins*, 539 U.S. at 524.

Trial counsel chose not to conduct an independent investigation into Petitioner's medical and academic background, instead choosing to rely on the pre-sentence report. Counsel's own observations of Petitioner and their knowledge of his significant alcohol and drug abuse, however, should have prompted them to investigate his medical records. Like the information presented in the records provided to counsel in *Wiggins*, the report of Dr. Darnall and counsel's own knowledge should have prompted them to further investigate Petitioner's medical records and history of drug use, particularly since their mitigation strategy was to show the profound influence drug and alcohol abuse played in Petitioner's life.[3] *See Wiggins*, 539 U.S. at 524. In light of the broad spectrum of mitigation evidence Ohio law permits a defendant to present, the fact that counsel focused only on Petitioner's family members in locating potential mitigating evidence constitutes an abject failure to fully investigate the possible mitigation evidence available. *See id.*

Accordingly, trial counsel's performance during the mitigation phase fell below "prevailing professional norms" and constituted deficient performance under *Strickland*.

## II.  Prejudice Prong of *Strickland*

Because the Ohio Court of Appeals reached the merits of the prejudice prong of Petitioner's ineffectiveness claim, we review this prong under the deferential standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA") to determine whether the state court unreasonably applied *Strickland* and related cases to Petitioner's claim. Under *Strickland*, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

---

[3]In addition, defense counsel's presentation at trial failed to reflect Petitioner's history of drug and alcohol abuse. Instead, it consisted mainly of family and detectives noting that Petitioner was a good person who helped his family and was just "slow." Significantly, the probation officer and Petitioner's former girlfriend, both of whom testified at Petitioner's post-conviction proceedings, would have provided the information regarding the significant influence of alcohol in Petitioner's life.

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, counsel's ineffective performance "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 690. In the specific context of a capital case, a petitioner establishes prejudice when "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating factors did not warrant death." *Id.* at 695. The Supreme Court has directed courts to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams*, 529 U.S. at 397.

At the penalty phase of the trial, Petitioner's counsel presented six witnesses in mitigation. A sergeant at the Mahoning County Jail testified that Petitioner had not violated any rules while incarcerated. Two officers in the Youngstown Police Department who were present at Petitioner's confession testified that Petitioner appeared remorseful during his confession. Petitioner's mother and sister testified that Petitioner was a slow learner, had trouble with drugs and alcohol, had no relationship with his father, and had a troubled relationship with his step-father.[4] In addition, they testified that Petitioner was a nice and non-violent person, gave the family money that he earned while in the Job Corps, and was religious. Petitioner's brother-in-law testified that Petitioner was not violent, helped around the house, and helped his son who had a learning disability. Dr. Darnall, the psychologist who performed the § 2929.03(D)(1) examination following trial, submitted a report to the court and also testified during mitigation. According to the report, Petitioner sustained several head injuries in his youth, including a hospitalization for a fractured skull at age twelve, a Full Scale I.Q. of 82 corresponding to the 12th percentile, and a reading level equivalent to grade 7.5. In

---

[4]Specifically, they described an altercation that occurred on Christmas, which resulted in Petitioner stabbing his step-father. Petitioner's step-father had returned from drinking and, after Petitioner's older sister talked back to him, he began choking her. When Petitioner's mother interfered, Petitioner's step-father directed his anger towards her, attempting to choke Petitioner's mother. To stop his step-father, Petitioner stabbed his step-father in the shoulder with a kitchen knife.

addition, Dr. Darnall testified that Petitioner had a chronic history of abuse of both alcohol and polysubstances, which qualified as a mental disorder.

During the state post-conviction proceedings, Petitioner's counsel presented testimony and affidavits from a number of witnesses who did not testify during trial, including Petitioner's former live-in girlfriend, his step-mother, a second sister, a physician, and state officials involved in Petitioner's case. This testimony largely focused on the severity of his drug abuse, the effect alcohol and drugs had on his behavior, the possible effect of head injuries, a forceps delivery and poor nutrition on his brain, his good behavior during previous incarcerations, and the greater role that his co-defendant played in the crime.

Noteworthy among the additional evidence presented during post-conviction proceedings were affidavits of state officials involved in the prosecution of Petitioner's case. Gary Trammel, the parole officer who prepared the pre-sentence investigation report, stated that he had supervised Petitioner and his brothers for several years and that Petitioner never gave him any problems. According to Trammel, Petitioner was not violent and "this crime was . . . totally out of character for him. [Petitioner] was a person who just could never get his act together. Drugs and alcohol were the major factors for all the trouble that he would get himself into." (J.A. at 798). He noted that Petitioner always did well while incarcerated and under supervision. Trammel further stated:

> In preparing the presentence report, I could not personally put down a death sentence recommendation. I still do not think that a death sentence is the appropriate punishment for [Petitioner]. The death-sentence recommendation was put in the presentence report pursuant to prosecuting attorney Gary Van Brocklin.

(J.A. at 799). As with other post-conviction affidavits, Trammel noted that he was available and ready to testify, but that [Petitioner's] trial attorneys never contacted him regarding "[his] opinions as to [Petitioner's character] or [his] recommendation for a sentence other than death." (*Id.*) In addition to Trammel's affidavit, the prosecuting attorney, Gary Van Brocklin, submitted an affidavit stating his feeling that "Melvin

Green planned the aggravated robbery and that [Petitioner] was a follower." (J.A. at 804).

Based on the testimony and affidavits submitted during post-conviction proceedings, Petitioner argues that he was prejudiced because his trial counsel failed to present important mitigating evidence. While much of the evidence discovered during post-conviction proceedings did not differ dramatically in subject matter or persuasive value from the evidence presented at sentencing, the testimony of Officer Trammel would have been reasonably likely to affect the sentencer's judgment as to whether death was warranted. At mitigation, counsel presented the testimony of three state officials–a guard at the prison where Petitioner was housed who testified to Petitioner's behavior while incarcerated, and two officers present during Petitioner's confession who testified that Petitioner appeared remorseful and took responsibility for his actions. Counsel did not present the testimony of any officers who knew about Petitioner's background or character as a result of Petitioner's previous contact with the criminal justice system, nor did they present the testimony of any officers who were closely involved in the preparation of Petitioner's case. Had counsel interviewed the parole officer who prepared the pre-sentence report rather than simply relying on the report without investigation, they would have discovered that Trammel was prepared to testify on Petitioner's behalf as to why he did not think death was warranted. The source of this testimony–the fact that it would have been from a law enforcement officer charged with preparing the case against Petitioner–is crucial. Testimony about Petitioner's background or character from his family members or doctors may not have had the same effect on the sentencer as testimony from an officer involved in his prosecution. Rather than being cumulative, such supportive testimony from Trammel would have "present[ed] a more sympathetic picture of [Petitioner]" that could have resulted in a finding of prejudice. *Jells*, 538 F.3d at 500.

Accordingly, the Ohio courts unreasonably applied *Strickland* by finding that there is not "a reasonable probability that, absent the errors, the [three-judge panel] . . .

would have concluded that the balance of aggravating and mitigating factors did not warrant death." *Strickland*, 466 U.S. at 695.

## CONCLUSION

Because counsel's investigation into mitigating evidence was deficient and there is a reasonable probability that, absent the insufficient investigation, the sentencer would have concluded that Petitioner should not have been sentenced to death, I would vacate Petitioner's sentence and remand for proceedings consistent with this dissent. I would leave Petitioner's conviction undisturbed.