[Cite as *State v. Henry*, 2018-Ohio-1128.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-846 |
| | | (C.P.C. No. 16CR-1572) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| William Henry, | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on March 27, 2018

---

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued**: *Barbara A. Farnbacher*.

**On brief**: *Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant. **Argued**: *John W. Keeling*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, P.J.

{¶ 1} This is an appeal by defendant-appellant, William Henry, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of assault and obstructing official business.

{¶ 2} On March 21, 2016, appellant was indicted on one count of assault, in violation of R.C. 2903.13, and one count of obstructing official business, in violation of R.C. 2921.31. The matter came for trial before a jury beginning October 4, 2016.

{¶ 3} The first witness for plaintiff-appellee, State of Ohio, was Marla Broadwater, a clerk at a Bureau of Motor Vehicles ("BMV") office, the Grove Licensing Agency, located at 1583 Alum Creek Drive. On February 12, 2016, appellant entered the BMV office on Alum Creek Drive and requested a replacement driver's license. Broadwater assisted

appellant that day, and appellant became "agitated" filling out a form because of an address discrepancy. (Tr. Vol. I at 38.) Appellant eventually "corrected" the information and Broadwater was able to process the form. (Tr. Vol. I at 40.)

{¶ 4} Broadwater then instructed appellant to proceed "to the photo booth" for an identification photograph. (Tr. Vol. I at 40.) Appellant was wearing a knit hat, and Broadwater said to him: "[S]ir, you're not going to be able to wear your head covering or your hat." (Tr. Vol. I at 41.) Broadwater testified that "once we got down there, he was saying that he wasn't going to remove * * * what he had on." (Tr. Vol. I at 44.)

{¶ 5} Other BMV managers were present, and they informed appellant head coverings were not allowed in photographs unless "for a religious purpose." (Tr. Vol. I at 44.) Appellant responded "it was for a religious purpose." (Tr. Vol. I at 44.) Broadwater inquired about the religious purpose, and appellant responded: "Orthodox Taekwondo." (Tr. Vol. I at 44.) Broadwater stated she had not "heard of that particular religion," and informed appellant he would not be able to have his picture taken. (Tr. Vol. I at 45.)

{¶ 6} BMV managers began researching whether this was "an acceptable type of headgear for that particular religion." (Tr. Vol. I at 45.) Broadwater returned to her work station while other supervisors discussed the matter with appellant. While waiting on another customer, Broadwater heard a "commotion going down, * * * chairs moving." (Tr. Vol. I at 46.) Broadwater walked toward the noise and observed appellant and an officer "down there on the floor." (Tr. Vol. I at 46.) She then observed another individual who "came out from the testing center and was assisting with what was going on down there." (Tr. Vol. I at 47.) The officer was eventually able to restrain appellant.

{¶ 7} Lisa Littler is a field representative with the Ohio Department of Public Safety; her duties include monitoring paperwork of deputy registrars at BMV locations. On February 12, 2016, Littler was performing duties at a work station at the Alum Creek BMV facility when Tara Grove, a BMV manager, asked her to come to the front office area and assist with a customer who was wearing a head covering.

{¶ 8} According to Littler, the state has a policy prohibiting individuals from being photographed with a head covering unless required for religious purposes; the policy is designed to deter "identity theft." (Tr. Vol. I at 70.) Littler explained that "if we can't find that religion or we don't recognize it, we * * * ask you to get a letter from your

church, your clergy, and bring that to us so that we can have that on file so that you can wear that hat or scarf." (Tr. Vol. I at 69.)

{¶ 9} On the date of the events at issue, BMV employees inquired about appellant's religion, and appellant "kept saying it was Raffian Condo or something." (Tr. Vol. I at 88.) Appellant "couldn't spell it," and a Google search did not indicate "a religion that Ohio recognized." (Tr. Vol. I at 68.) After further research, BMV personnel "told him that all we saw was the Rastafarian hat * * * and it wasn't recognized in the State of Ohio as a religion here and that he couldn't wear it." (Tr. Vol. I at 77.) Littler explained to appellant he could obtain a "letter and come back, or we could issue [the license] today without the hat on, and then if he got the letter, he could also come back to have it corrected." (Tr. Vol. I at 70.) Appellant "was yelling," and told Littler "he was not leaving without it." (Tr. Vol. I at 70.) Appellant had his arm extended and was pointing his finger "about six to eight inches" from Littler's face. (Tr. Vol. I at 82.)

{¶ 10} Glenn Rondo, a BMV investigator, came to the front area and assisted Littler in explaining the policy to appellant. An officer also approached and stood near Littler behind the counter. Littler testified that appellant "told them that he wasn't talking to anybody but me, and he continued to point at me to say that he was talking to me." (Tr. Vol. I at 71.)

{¶ 11} Appellant "was getting so loud that the officer kept saying, 'Sir, calm down, please * * * you're scaring the other customers.' And [appellant] wouldn't acknowledge him." (Tr. Vol. I at 71.) Littler testified that appellant "just kept talking to me about how I was going to issue the I.D." (Tr. Vol. I at 71.) The officer "kept saying, 'Sir,' probably three, four times, maybe five times." (Tr. Vol. I at 71.)

{¶ 12} The officer finally laid his hand "very lightly" on appellant's shoulder "to say, 'Sir,' * * * and when he did that, [appellant] jerked away and said, 'Step back and give me three feet of space. Get out of my space.' " (Tr. Vol. I at 71.) The officer said " 'I'm not in your space. I just need you to calm down. You're scaring our other customers. * * * I'm going to have to ask you to leave.' " (Tr. Vol. I at 72.) Appellant "continued to yell and told the officer that he was talking to me [Littler], not him. And the officer then said, 'Sir, I'm going have to place you under arrest.' " (Tr. Vol. I at 72.) The officer "reached for the handcuffs," and as he attempted to place the handcuffs on appellant's wrist, the two men "were on the floor." (Tr. Vol. I at 83-84.)

{¶ 13} At that point, BMV "employees up front were all pushing the panic buttons * * * for assistance." (Tr. Vol. I at 72.) Another individual in the building "helped pull [appellant] off * * * the trooper, and then once they got [appellant] to his feet and got the handcuffs on him, the officer proceeded to take him out the doors." (Tr. Vol. I at 84.) Littler testified that "they no more than got through the first set of doors, and [appellant] threw [himself] backwards on to the officer, and they landed up against the wall in the little walkway of the two doors." (Tr. Vol. I at 84.)

{¶ 14} On February 12, 2016, Rondo, who has an office at the Alum Creek Drive facility, was asked to assist at the front desk with a customer who had a disagreement with a clerk regarding a head covering. Rondo testified that he "came out to try to help the clerk explain to the customer what we were doing and what was going on." (Tr. Vol. I at 101.) Rondo described appellant as "agitated." (Tr. Vol. I at 102.) Appellant's "voice was starting to rise. You could tell he was getting upset as time went on." (Tr. Vol. I at 102.) According to Rondo, "we were trying to explain to the customer that unless you have some sort of a religious exception, we cannot allow you to take a photograph with any kind of head covering. So we're just trying to find out what religion he was involved in and if it was an approved religion." (Tr. Vol. I at 100.)

{¶ 15} Rondo further testified: "[T]he deputy came out, and * * * the customer was getting really agitated and starting to get really, really loud. At some point, the deputy came around the counter and explained to the customer that he had to leave." (Tr. Vol. I at 102.) The officer placed his hand on appellant's shoulder, and appellant "knocked it off * * * and then they just started wrestling." (Tr. Vol. I at 103.) The two individuals "started tussling and they ended up on the floor." (Tr. Vol. I at 104.)

{¶ 16} Randy Clucas has been a police officer with the Ohio State Highway Patrol ("OSP") "for just over five years." (Tr. Vol. I at 117.) Officer Clucas, who attended the police academy for training, described his general duties with the OSP as "[b]uilding security for the most part of my shift. We do routine traffic patrols as well. We enforce the Ohio Revised Code. Individuals with warrants, we also take care of them as well." (Tr. Vol. I at 118.)

{¶ 17} On February 12, 2016, Officer Clucas was on duty as a uniformed police officer at 1583 Alum Creek Drive. On that date, BMV employee Grove informed Officer Clucas that a customer was "upset towards them," and asked Clucas to "hang around * * *

just to see what's going on with this individual."  (Tr. Vol. I at 121, 122.)   Officer Clucas described the individual as "a male black, had a Rastafarian-style hat on, * * * a knitted hat, a salt and pepper beard."  (Tr. Vol. I at 123.)   At trial, Officer Clucas identified appellant as the customer at the BMV office that day.

{¶ 18} Officer Clucas observed appellant "getting * * * more loud and aggressive in his body language," and "leaning over towards the counter in an aggressive way."  (Tr. Vol. I at 122.)  Appellant's shoulders were "slanted forward," and he was pointing his hands at the clerk.  (Tr. Vol. I at 122.)  Appellant "was yelling about his hat," stating that it was a "religious hat, and that he should be allowed to wear it in his picture.  Then he began saying * * * if I was white, * * * I wouldn't be having this problem right now."  (Tr. Vol. I at 124-25.)

{¶ 19} The officer stepped up to the counter and stood beside the BMV clerk, attempting to draw appellant's attention.  Officer Clucas, who testified there were "a lot of people in the BMV at the time," told appellant that he could not "be yelling like this in front [of] all these people.  You're going to get people out here in the crowd upset."  (Tr. Vol. I at 126.)  Appellant looked over at Officer Clucas but did not respond to him; rather, appellant "just kept on directing his attention toward the BMV investigators."  (Tr. Vol. I at 126.)  Officer Clucas then "tried to get his attention again * * * saying, 'Hey, if you have a problem, just come talk to me in the back, and we'll just discuss it without any issues whatsoever.' "  (Tr. Vol. I at 126.)

{¶ 20} Officer Clucas then stepped out from behind the counter.  The officer "didn't want to embarrass" appellant if he "could have avoided it even though [appellant] was pretty upset with the BMV staff."  (Tr. Vol. I at 127.)   Officer Clucas attempted to "calm down" appellant by talking with him.  (Tr. Vol. I at 127.)   When this proved unsuccessful, the officer told appellant: "Either you're going to quit this, or I'm going to have to criminal trespass you."  (Tr. Vol. I at 128.)  Appellant "began saying, 'This is just like Ferguson. This is just like Ferguson.' "  (Tr. Vol. I at 128.)  Some of the customers "were saying, 'This is not like Ferguson at all.'  So the people were starting to get upset."  (Tr. Vol. I at 128.)  Officer Clucas "stepped closer to [appellant] and advised him that * * * '[w]e're not going to play this race game.  That's not what this is about.  You're upset about this.  I would like to go talk to you.' "  (Tr. Vol. I at 128.)

{¶ 21} Officer Clucas placed his hand on appellant's elbow and shoulder in an attempt to escort him out the door. At that point, appellant pushed Officer Clucas on the chest and told the officer he was "invading my private space or personal space." (Tr. Vol. I at 130.) The officer then reached for his handcuffs "and said, '[w]ell, you're done. Place your hands behind your back. You're under arrest.' " (Tr. Vol. I at 128.)

{¶ 22} As Officer Clucas attempted to place the handcuffs on appellant's wrist, appellant "lunged" at the officer "with his arm." (Tr. Vol. I at 130.) At that point, Officer Clucas "tried to grab [appellant's] arm to try to wrap him," but the officer's "back ended up hitting the customer service counter behind [him]," and Officer Clucas "ended up falling on [his] back." (Tr. Vol. I at 130.) The officer further testified: "The suspect then got on top of me in a mount position. I was on my back. He was on me * * * kneeling down over top of me up to my chest and started to gouge my left eye with his right thumb." (Tr. Vol. I at 130.) Officer Clucas related that appellant "was pressing his thumb into my eye, my eyeball socket. And then also at the same time he kept on repeating, 'You can't take me. You can't take me. You don't have what it takes,' * * * basically telling me that I'm not going to be able to get out of this." (Tr. Vol. I at 131-32.) At that point, the officer reached out with his left arm and "grabbed some of [appellant's] hair," and Officer Clucas then "began using facial strikes" with his right hand. (Tr. Vol. I at 130.)

{¶ 23} Eventually, "[s]omebody from the crowd" pushed appellant away from the officer, and Officer Clucas and appellant both stood up. (Tr. Vol. I at 132.) Officer Clucas testified that appellant "then tried to lunge at me in a tackling spear position, and I put him into a * * * standing headlock." (Tr. Vol. I at 132.) As Clucas held appellant in that position, a BMV maintenance worker assisted the officer in handcuffing appellant. Officer Clucas then "escorted him outside the property." (Tr. Vol. I at 132.) During this time, appellant "kept talking about the Ferguson thing. Then he kept on calling me a tyrant. He was resisting me all the way * * * to the office where we keep our detainees." (Tr. Vol. I at 133.)

{¶ 24} Officer Clucas testified that, as a result of the altercation, he had a "black eye," his "nose was busted," and his back, wrist, and left shoulder were in pain. (Tr. Vol. I at 135.) Officer Clucas went to an emergency room for treatment after his shift ended. Upon returning to work, Clucas was placed on light duty assignment because of shoulder

pain, and he subsequently had shoulder surgery. At trial, the officer identified photographs taken of his eye, neck, and hands following the incident.

{¶ 25} Grove is the assistant manager at the Grove Licensing Agency. On February 12, 2016, appellant came into the office and spoke with one of the clerks, Broadwater. There was a "discrepancy in his address," and Broadwater requested that Grove speak to appellant. (Tr. Vol. II at 159.) Grove explained to appellant the office system was "linked to the United States Postal Service, * * * so that's the correct address. We have to go with that." (Tr. Vol. II at 159.) Grove went back to her desk, and appellant was directed to the photo booth where he was asked to remove his head covering. Appellant "would not do it," stating "it was for religious purposes." (Tr. Vol. II at 159.)

{¶ 26} Grove asked Littler, a field representative, to go to the front and assist with the customer. (Tr. Vol. II at 159.) Appellant "began getting irate, began raising his voice." (Tr. Vol. II at 160.) At that point, Grove informed Officer Clucas, "the officer, * * * that [appellant] was starting to get irate and starting to raise his voice." (Tr. Vol. II at 160.)

{¶ 27} Grove "did not see the initial altercation." (Tr. Vol. II at 164.) She "heard the yelling of * * * people, customers, some of our employees. People were yelling, and I came out and saw [appellant and Officer Clucas] on the ground wrestling." (Tr. Vol. II at 164.) Grove stated that Officer Clucas and appellant "were on the floor * * * tangled up, * * * not letting go. * * * Officer Clucas was trying to regain control and couldn't because he was being fought." (Tr. Vol. II at 164.) Grove began "pressing the panic buttons * * * that alert the highway patrol's call center." (Tr. Vol. II at 164.)

{¶ 28} Following the altercation, Grove "looked at the surveillance footage." (Tr. Vol. II at 165.) Grove turned the agency's surveillance video over to OSP, and the testing center also turned over a surveillance video.

{¶ 29} On February 12, 2016, Michael Paul Lester, an intern with the Department of Public Safety, was performing maintenance duties at the Alum Creek Drive facility; while checking on a front entrance door, Lester noticed that customers seated inside had "jumped out of their chairs." (Tr. Vol. II at 175.) Lester then observed "the police officer[,] [appellant,] and another gentleman on the floor wrestling." (Tr. Vol. II at 175.) Lester stated that appellant "was on the opposite side of the police officer with another gentleman straddling both of them but laying more on top of [appellant]." (Tr. Vol. II at 176.) Appellant "was reaching and had ahold of the police officer's face, his upper face.

And the police officer had reached around and actually had grabbed some of [appellant's] hair and was yanking back on him, and then [appellant] had let go of the officer's face." (Tr. Vol. II at 179.)

{¶ 30} Lester "noticed that the officer's handcuffs were on the ground a couple feet from him." (Tr. Vol. II at 178.) Lester picked up the handcuffs and placed them in the officer's hand. The officer and appellant continued to struggle, and the officer dropped the handcuffs; appellant's "foot kicked the cuffs even farther away." (Tr. Vol. II at 178.) Lester retrieved the handcuffs again and held them in his hand. Appellant and the officer eventually stood up, and Lester grabbed appellant's arm in order to assist the officer "in restraining him." (Tr. Vol. II at 179.) Lester helped the officer place the handcuffs on appellant.

{¶ 31} On February 12, 2016, OSP Sergeant Hugh Fredendall was notified of an incident at the Alum Creek Drive BMV facility. He went to the facility to speak with Officer Clucas and to take photographs of the officer's injuries. Sergeant Fredendall instructed Officer Clucas to obtain witness statements as to the incident, and to obtain a copy of the surveillance video from the BMV manager. The sergeant subsequently received surveillance video.

{¶ 32} Sergeant Fredendall testified as follows regarding OSP procedure for handling of surveillance video: "The officer will write up the case report. I will go in * * * or a supervisor will go in and put in any type of documentation in that report as to the findings. Then from there, it just goes up through our chain of command. It goes to my supervisor, then to his, and ultimately it goes to the RTR committee." (Tr. Vol. II at 196.) Sergeant Fredendall stated that "[s]omewhere * * * going through that chain the video came up missing." (Tr. Vol. II at 196.) He was later informed that the video "had been rewritten over." (Tr. Vol. II at 197.) He denied that OSP purposely destroyed the video.

{¶ 33} Following deliberations, the jury returned verdicts finding appellant guilty of assault and obstructing official business. By judgment entry filed November 22, 2016, the trial court sentenced appellant to two years of community control.

{¶ 34} On appeal, appellant sets forth the following six assignments of error for this court's review:

**ASSIGNMENT OF ERROR NUMBER ONE**

THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT THE ALLEGED VICTIM OF THE ASSAULT WAS A PEACE OFFICER AS DEFINED IN R.C. 2935.01 SINCE "SPECIAL POLICE OFFICERS" OF THE HIGHWAY PATROL ARE NOT TROOPERS AND ARE NOT DEFINED AS PEACE OFFICERS BY THE STATUTE.

**ASSIGNMENT OF ERROR NUMBER TWO**

THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE ASSAULT AND OBSTRUCTING OFFICIAL BUSINESS CONVICTIONS WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A FINDING OF GUILT BEYOND A REASONABLE DOUBT.

**ASSIGNMENT OF ERROR NUMBER THREE**

THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE ASSAULT AND OBSTRUCTING OFFICIAL BUSINESS CONVICTIONS WHEN GUILT WAS NOT ESTABLISHED BY THE MANIFEST WEIGHT OF THE EVIDENCE BEYOND A REASONABLE DOUBT.

**ASSIGNMENT OF ERROR NUMBER FOUR**

THE DEFEINDANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AS MANDATED BY THE FEDERAL AND STATE CONSTITUTIONS WHEN COUNSEL FAILED TO FILE A MOTION TO DISMISS BASED UPON THE DESTRUCTION OF THE VIDEO RECORDING OF THE INCIDENT BY AGENTS OF THE STATE.

**ASSIGNMENT OF ERROR NUMBER FIVE**

THE TRIAL COURT ERRED WHEN IT FAILED TO INSTURCT THE JURY, PURSUANT TO R.C. 2945.11, ON ALL MATTERS OF LAW NECESSARY TO RENDER A VERDICT AND THE DEFENDANT WAS ALSO DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO THE FAILURE OF COUNSEL TO REQUEST ESSENTIAL JURY INSTRUCTIONS RELEVANT TO HIS DEFENSE.

ASSIGNMENT OF ERROR NUMBER SIX

THE TRIAL COURT ERRED WHEN IT SENTENCED THE DEFENDANT ON BOTH THE ASSAULT AND OBSTRUCTING OFFICIAL BUSINESS WHEN THEY ARE ALLIED OFFENSES OF SIMILAR IMPORT AND HE CAN ONLY BE SENTENCED ON ONE.

{¶ 35} Appellant's first, second, and third assignments of error are interrelated and will be addressed together. Under these assignments of error, appellant challenges both the sufficiency and the weight of the evidence underlying his convictions for assault and obstructing official business.

{¶ 36} Under Ohio law, " '[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.' " *State v. Samatar,* 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 94 (10th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. In addressing a sufficiency of the evidence claim, an appellate court "must determine whether the evidence presented at trial, viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 37} By contrast, in considering whether a conviction is against the manifest weight of the evidence, an appellate court "reviews the record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at ¶ 111, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 38} We begin with appellant's assertion, raised under the first assignment of error, that the state presented insufficient evidence to establish that the alleged victim of the assault offense was a "peace officer" as defined under R.C. 2935.01. According to appellant, the only OSP employees defined as peace officers under R.C. 2903.13(D)(1) and 2935.01(B) are troopers and the superintendent of OSP.

{¶ 39} R.C. 2903.13(A) defines the offense of assault, and states in part: "No person shall knowingly cause or attempt to cause physical harm to another." Further, R.C. 2903.13(C)(5) states in part: "If the victim of the offense is a peace officer * * * while

in the performance of their official duties, assault is a felony of the fourth degree." Pursuant to R.C. 2903.13(D)(1), the term " '[p]eace officer' has the same meaning as in section 2935.01 of the Revised Code."

{¶ 40} As observed by one court, R.C. 2935.01(B) "sets forth a lengthy definition of 'peace officer' [which] includes any kind of police officer, law enforcement officer, enforcement agent, etc." *State v. McKinley,* 5th Dist. No. 2006CA00176, 2007-Ohio-3512, ¶ 11. R.C. 2935.01(B) states in part: " 'Peace officer' includes, * * * for the purpose of arrests within those areas, for the purposes of Chapter 5503. of the Revised Code, and the filing of and service of process relating to those offenses witnessed or investigated by them, the superintendent and troopers of the state highway patrol."

{¶ 41} Appellant argues that Officer Clucas testified at trial he was a "police officer" with OSP (i.e., not a trooper). Appellant contends that Officer Clucas is actually a "special police officer" under R.C. 5503.09, and further argues that special police officers are distinguishable from troopers. According to appellant, because a police officer of OSP is not specifically listed as a "peace officer" under R.C. 2935.01, there was insufficient evidence to convict him of assault of a peace officer for purposes of the sentencing enhancement under R.C. 2903.13(C)(5).

{¶ 42} In response, the state acknowledges a distinction between OSP troopers and OSP police officers, but asserts there was sufficient evidence establishing that Officer Clucas was a "peace officer" within the meaning of R.C. 2935.01(B). In support, the state maintains that the list contained in R.C. 2935.01(B) is not exclusive or exhaustive, and the evidence indicated Officer Clucas was properly performing statutory law enforcement duties under R.C. 5503.09 as a "peace officer" at the time of the events at issue. Upon review, we agree.

{¶ 43} In interpreting the language of R.C. 2935.01, the Supreme Court of Ohio has held that "[t]he use of the word 'includes' in the definition of 'peace officer' evidences an intent that the General Assembly did not mean to exclude other constituted officers who may be granted enforcement powers by the General Assembly." *State v. Colvin,* 19 Ohio St.2d 86, 92 (1969). Rather, in order to determine if an individual is a "peace officer" for purposes of R.C. 2935.01, "it is necessary to ascertain the extent of his [or her] enforcement powers." *Id.*

{¶ 44} In *Colvin,* the Supreme Court applied the statutory definition under R.C. 2935.01(B) to hold that investigators for the State Dental Board, "charged with the responsibility of enforcing the statutes regulating the practice of dentistry and ferreting out violators thereof * * * are 'peace officers,' within the meaning of those words as used in Section 2935.09, Revised Code." *Id.* at 93. In *State v. Glenn,* 28 Ohio St.3d 451 (1986), the Supreme Court held that a volunteer reserve deputy sheriff who was transporting a prisoner from the prison to a hospital was acting as a "peace officer" for purposes of R.C. 2929.04(A)(6) and 2935.01(B). In so holding, the court in *Glenn* found that the victim "was in the process of activities performed pursuant to his duties to enforce Ohio's laws" at the time he was shot and killed. *Id.* at 454.

{¶ 45} Ohio appellate courts have also determined that certain officers, albeit not specifically listed under R.C. 2935.01, are "peace officers" within the meaning of that term. *See*, *e.g., State v. Moore,* 2d Dist. No. 18337 (Jan. 12, 2001) (hospital security officer, who completed Ohio State Peace Officer training program and was designated a "Special Policeman," and who wore a uniform and carried "same equipment that police officers traditionally carry," was "acting 'in the performance of his official duties' " as a peace officer when he acted to restrain defendant at hospital); *Cleveland Police Patrolmen's Assn. v. Cleveland,* 118 Ohio App.3d 584, 588 (8th Dist.1997) (institutional guards whose primary duties included transporting prisoners, and who received additional training and were authorized to carry firearms, were peace officers with law enforcement duties for purposes of R.C. 2935.01); *State v. Cammon,* 8th Dist. No. 91574, 2009-Ohio-4706, ¶ 19 (state presented sufficient evidence demonstrating that housing authority officer was a "peace officer" acting in his official capacity at time of assault; officer presented testimony that he was employed by housing authority police department, that he was a duly commissioned officer with the state, and that he was dressed in full uniform and on duty at time of incident).

{¶ 46} As noted, appellant contends the state presented insufficient evidence that Officer Clucas was a peace officer based on the fact that his duties, pursuant to R.C. 5503.09, are those of a special police officer. We disagree.

{¶ 47} R.C. 5503.09 states in part that "[t]he superintendent of the state highway patrol * * * may designate one or more persons to be special police officers to preserve the peace and enforce the laws of this state with respect to persons and property under their

jurisdiction and control."  The statue provides that special police officers "are vested with the same powers of arrest as police officers under section 2935.03 of the Revised Code when exercising their responsibilities," and such officers are "required to complete peace officer basic training for the position to which they have been appointed as required by the Ohio peace officer training commission as authorized in section 109.73 of the Revised Code."  These officers "also shall take an oath of office, wear the badge of office, and provide bond to the state * * * for the proper performance of their duties." R.C. 5503.09.

{¶ 48} In the present case, Officer Clucas testified he attended the police academy, his duties included building security, routine traffic patrols, enforcing the Ohio Revised Code, and dealing with individuals with outstanding warrants.  On the date of the incident, Officer Clucas was in uniform and performing his assigned duties at the Alum Creek Drive facility.  As set forth above, R.C. 5503.09 authorizes the superintendent to designate special police officers "to *preserve the peace and enforce the laws* of this state with respect to persons and property under their jurisdiction and control," and special police officers are "vested with the same powers of arrest as police officers under" R.C. 2935.03.  (Emphasis added.)  As also noted, the Supreme Court has interpreted the word "includes" in the definition of "peace officer" as expansive, not limiting.  *Colvin* at 92.  Upon review of the record and applicable statutes, including a consideration of the extent of the enforcement powers at issue, we find the state presented sufficient evidence that Officer Clucas was acting as a "peace officer" under R.C. 2935.01 and 2903.13.

{¶ 49} In light of that determination, we next consider whether the state presented sufficient evidence upon which the trier of fact could have found all the essential elements of assault and obstructing official business beyond a reasonable doubt.  We have previously set forth the elements of assault under R.C. 2903.13.  The offense of obstructing official business is defined under R.C. 2921.31(A), which states: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."  R.C. 2921.31(B) states in part: "If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree."

{¶ 50} As to the assault conviction, appellant argues he was only attempting to exercise his right to free speech and that he did not knowingly cause or attempt to cause physical harm to the officer. According to appellant, the officer was the first to use force by grabbing him.

{¶ 51} R.C. 2901.22(B) states in part: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." In general, whether an individual acts knowingly "must be determined from all the surrounding facts and circumstances," and "[t]herefore, 'the test for whether a defendant acted knowingly is a subjective one, but it is decided on objective criteria.' " *State v. Bettis,* 1st Dist. No. C-060202, 2007-Ohio-1724, ¶ 9, quoting *State v. McDaniel*, 2d Dist. No. 16221 (May 1, 1998).

{¶ 52} In the present case, the state presented evidence appellant became agitated and began yelling at BMV personnel in regard to their request that he remove his head covering for a driver's license photograph. Officer Clucas testified that he attempted to calm appellant down, and warned him that he could not be "yelling like this in front [of] all these people." Littler testified that Officer Clucas attempted to calm appellant down, telling appellant he was "scaring our other customers," and that he was "going to have to ask [him] to leave." (Tr. Vol. I at 72.) Rondo similarly testified that appellant "was getting really agitated and starting to get really, really loud" and that "the deputy came around the counter and explained to [appellant] that he had to leave." (Tr. Vol. I at 102.)

{¶ 53} When appellant refused to comply, the officer approached appellant and placed his hand on appellant's elbow and shoulder, at which point appellant pushed the officer in the chest and told the officer he was "invading" his "space." Officer Clucas then reached for his handcuffs, but appellant lunged at the officer, causing the officer's back to hit the nearby counter; the officer fell to floor, landing on his back. Appellant then got on top of the officer and "started to gouge" the officer's left eye with his right thumb. Michael Lester, who witnessed the altercation, stated that appellant "was reaching and had ahold of the police officer's face." Grove testified that the officer was attempting to regain control but "couldn't because he was being fought." Officer Clucas testified as to injuries

to his eye, back, wrist, and shoulder as a result of the incident, and photographs of the officer were admitted into evidence.

{¶ 54} Here, construing the evidence most strongly in favor of the state, as we are required to do in considering a sufficiency challenge, the state presented sufficient evidence to support the elements of assault beyond a reasonable doubt. Further, there was sufficient evidence that Officer Clucas was engaged in the performance of his official duties at the time of the assault for purposes of R.C. 2903.13.

{¶ 55} The offense of obstruction of official business, pursuant to R.C. 2921.31(A), has the following elements: "(1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant does so act without a privilege to do so." *State v. Dice,* 3d Dist. No. 9-04-41, 2005-Ohio-2505, ¶ 19. Thus, under Ohio law, "[a] conviction under R.C. 2921.31(A) requires proof of an affirmative act that hampered or impeded the performance of the lawful duties of a public official." *State v. Overholt,* 9th Dist. No. 2905-M (Aug. 18, 1999). Further, "[t]he proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." *State v. Wellman,* 173 Ohio App.3d 494, 2007-Ohio-2953, ¶ 12 (1st Dist.).

{¶ 56} Verbal acts alone can constitute a "proscribed act" under the statute. *State v. Jeter*, 1st Dist. No. C-040572, 2005-Ohio-1872, ¶ 12, citing *State v. Lazzaro,* 76 Ohio St.3d 261 (1996). In this respect, Ohio courts have upheld convictions for obstructing official business in instances in which an individual prevented law enforcement officers from gaining control of a situation based upon "belligerent and argumentative" behavior. *Wellman* at ¶ 13. *See also State v. Florence,* 12th Dist. No. CA2013-08-148, 2014-Ohio-2337, ¶ 13 (conviction for obstructing official business upheld where defendant's "purposeful loud, boisterous, and uncooperative conduct made the performance of [the officers'] duties more difficult").

{¶ 57} Courts have also held that a defendant's refusal to leave the scene when requested, as well as verbal altercation with officers and interference with their attempt to effectuate an arrest, constituted sufficient acts upon which the jury could conclude the defendant purposefully hampered the officers' official duties. *Overholt. See also State v.*

*Gau,* 11th Dist. No. 94-A-0031 (Mar. 17, 1995) (oral statements by defendant and act of pushing officer sufficient to support conviction for obstructing official business).

{¶ 58} In the present case, the state presented evidence appellant became argumentative, yelled at BMV agency employees, pointed his finger in the face of an employee, refused the officer's requests to calm down and to leave the building, pushed the officer and resisted the officer's attempt to remove him from the agency. Upon review, there was sufficient evidence upon which a trier of fact could have found that appellant acted purposely in impeding the officer from performing his duties, and that in doing so created a risk of physical harm. Accordingly, we reject appellant's claim insufficient evidence existed to support his conviction for obstructing official business.

{¶ 59} Turning to appellant's manifest weight challenge, we find the jury did not lose its way and create a manifest injustice in rendering guilty verdicts for assault and obstructing official business. A conviction is not against the manifest weight of the evidence because the trier of fact chose to credit the state's version of events. *State v. Peasley,* 9th Dist. No. 25062, 2010-Ohio-4333, ¶ 18. Here, there was competent, credible testimony by the state's witnesses regarding appellant's conduct on the date of the events.

{¶ 60} Appellant's claim that the officer was the aggressor and he used excessive force is not supported by the record. There was evidence presented which, if believed, indicated appellant, while engaged in a verbal dispute with BMV employees, ignored the officer's admonition to calm down. When appellant refused to comply, Officer Clucas laid his hand "very lightly" on appellant's shoulder, at which time appellant shoved the officer and then lunged at him, causing the officer's back to hit the desk counter; as noted above, the evidence further indicated that the officer fell to the ground, at which time appellant began gouging the officer's eye with his thumb. Lester, who witnessed the altercation, testified appellant "had ahold of the police officer's face, his upper face." As also noted, the evidence before the jury included photographs depicting the officer's face following the incident.

{¶ 61} Appellant also contends the state's failure to preserve the surveillance video casts doubt on its version of events. Appellant suggests that the video evidence was deliberately destroyed, and that it would have incriminated the officer. The record, however, does not support these assertions. At trial, Sergeant Fredendall testified he directed Officer Clucas to obtain any surveillance video from the licensing agency. The

evidence indicated that video was obtained and turned over to OSP, but that Sergeant Fredendall was subsequently informed it "had been rewritten over." Sergeant Fredendall denied OSP purposely destroyed any videos. Here, the jury was not required to infer that OSP acted in bad faith or willfully destroyed surveillance video, nor was there any evidence suggesting the state was aware of exculpatory materials on any videos.

{¶ 62} Based on the foregoing, appellant's first, second, and third assignments of error are not well-taken and are overruled.

{¶ 63} Under the fourth assignment of error, appellant argues his trial counsel rendered ineffective assistance of counsel. Specifically, appellant contends counsel's performance was deficient in failing to file a motion to dismiss based on the misplaced surveillance videos.

{¶ 64} In order to establish an allegation of ineffective assistance of counsel, a defendant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Jones*, 8th Dist. No. 102260, 2016-Ohio-688, ¶ 15, citing *Strickland v. Washington,* 466 U.S. 668, 687-88, 694 (1984); *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus.

{¶ 65} The failure of counsel to file a motion, "in and of itself, is not per se ineffective assistance of counsel." *State v. Schlosser,* 3d Dist. No. 14-10-30, 2011-Ohio-4183, ¶ 34, citing *In re Smith*, 3d Dist. No. 5-01-34, 2002-Ohio-695, citing *State v. Vires*, 25 Ohio App.2d 70 (2d Dist.1970); *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Rather, "[w]ithout proving that trial counsel was deficient for failing to make certain motions and that those motions had a reasonable probability of success, the ineffective assistance of counsel claim fails." *Id.*

{¶ 66} Appellant contends the failure to file a motion to dismiss was prejudicial, asserting it is "fairly clear" that agents took it upon themselves to suppress the videos because they were favorable to him and not supportive as to the claims of the agents. According to appellant, had defense counsel filed a motion to dismiss based on the disappearance of the video recordings, the trial court would have likely dismissed the charges.

{¶ 67} We find appellant's arguments unpersuasive. As previously discussed, Sergeant Fredendall denied OSP purposely destroyed surveillance video and, despite appellant's suggestion that the videos must have contained evidence favorable to him, there is nothing in the record to indicate the videos would have been exculpatory. Here, appellant cannot demonstrate that counsel's performance was deficient or that a motion to dismiss would have been successful.

{¶ 68} Appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 69} Under the fifth assignment of error, appellant argues the trial court erred in failing to instruct the jury with respect to an individual's right to protect him or herself from excessive or unnecessary force. Appellant argues that such an instruction would have been consistent with his defense that he was only attempting to defend himself and not trying to harm the officer. Appellant relies in part on R.C. 2945.11, which states in part: "In charging the jury, the court must state to it all matters of law necessary for the information of the jury in giving its verdict."

{¶ 70} In general, when determining whether a proposed jury instruction shall be given to a jury, "the trial court must decide if sufficient evidence was presented to warrant such an instruction." *State v. Holaday,* 4th Dist. No. 1210 (Aug. 11, 1987). In the instant case, appellant did not request an instruction on excessive force and, therefore, "this court's review is under the plain error standard." *State v. Bridgewater,* 10th Dist. No. 07AP-535, 2008-Ohio-466, ¶ 24. Under this standard, "[p]lain error is error that involves an 'obvious defect in the trial proceedings,' and such error 'must have affected the outcome of the trial.' " *Id.,* quoting *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002).

{¶ 71} In response to appellant's argument, the state asserts the trial court did not err because there was insufficient evidence to support an instruction that Officer Clucas used excessive or unnecessary force. We agree. In addressing appellant's manifest weight challenge, we previously determined that the evidence did not support appellant's claim that Officer Clucas was the aggressor and/or that he used excessive force. Accordingly, the trial court did not commit plain error in failing to provide an instruction on excessive force.

{¶ 72} Appellant's fifth assignment of error is not well-taken and is overruled.

{¶ 73} Under the sixth assignment of error, appellant asserts the trial court erred in sentencing him on both assault and obstructing official business. Appellant contends

the offenses are allied offenses of similar import that the court should have merged for purposes of sentencing.

{¶ 74} R.C. 2941.25 states as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 75} The Supreme Court, in construing the above statutory provisions, has held: "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. A defendant may be convicted and sentenced for multiple offenses when: "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation." *Id.* at ¶ 25.

{¶ 76} As noted by the state, appellant did not raise the issue of merger during the sentencing hearing.  Under Ohio law, "[a]n accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 3.

{¶ 77} Ohio courts have "concluded that assault and obstructing official business convictions will not merge for sentencing when committed by separate conduct." *State v. Ulinski*, 6th Dist. No. L-16-1074, 2016-Ohio-8386, ¶ 11.  *See, e.g., State v. Standifer,* 12th Dist. No. CA2011-07-071, 2012-Ohio-3132, ¶ 68 (offenses of assault and obstructing official business committed by separate conduct where defendant's act of kicking officer was separate from defendant's conduct in screaming, jerking, and pulling away from

officer while in custody); *State v. Hendricks,* 8th Dist. No. 101864, 2015-Ohio-2268, ¶ 23 (defendant's assault convictions, stemming from physical confrontation with deputies, constituted separate conduct from his conviction for obstructing official business when he initially interrupted proceedings and failed to comply with deputy's order).

{¶ 78} In the present case, appellant cannot demonstrate plain error as the record sets forth facts indicating the offenses were committed separately. Here, the offense of obstructing official business was initially committed when appellant became belligerent and disruptive, yelling at BMV employees, disregarding the officer's admonition to calm down, and refusing the officer's instruction to leave the premises. The assault occurred subsequently when the officer attempted to effectuate an arrest and appellant pushed the officer, lunged at him, and began gouging the officer's eye.

{¶ 79} Having failed to demonstrate plain error, appellant's sixth assignment of error is overruled.

{¶ 80} Based on the foregoing, appellant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____